STATE OF MINNESOTA, By the MINNESOTA POLLUTION CONTROL AGENCY, Petitioner,

v.

UNITED STATES NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

Northern States Power Company, Intervenor.

NEW ENGLAND COALITION ON NUCLEAR POLLUTION, Petitioner,

v.

UNITED STATES NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

Vermont Yankee Nuclear Power Corporation, Intervenor.

Nos. 78-1269, 78-2032.

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1979.

Decided May 23, 1979.

Anthony Z. Roisman, Washington, D. C., with whom Karin P. Sheldon, Washington, D. C., was on brief, for petitioner in No. 78–2032.

Jocelyn Furtwangler Olson, Sp. Asst. Atty. Gen., Roseville, Minn., with whom Warren R. Spannaus, Atty. Gen., State of Minnesota, St. Paul, Minn., was on brief, for petitioner in No. 78–1269.

Stephen F. Eilperin, Sol., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom William M. Shields, Atty., U. S. Nuclear Regulatory Commission, Edward J. Shawaker and Michael A. McCord, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Robert E. Zahler, Washington, D. C., with whom Wm. Bradford Reynolds, Washington, D. C., was on brief, for intervenor in No. 78–1269.

Thomas G. Dignan, Jr., Boston, Mass., with whom R. K. Gad III and Faith S. Hochberg, Boston, Mass., were on brief, for intervenor in No. 78–2032.

James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for respondent, United States of America.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

Concurring statement filed by TAMM, Circuit Judge.

LEVENTHAL, Circuit Judge:

Petitioners challenge an order of the Atomic Safety and Licensing Appeal Board (Appeal Board), a unit of the Nuclear Regulatory Commission (NRC). The Appeal Board affirmed initial decisions of Atomic Safety and Licensing Boards (Licensing Boards) granting two operators of nuclear power plants amendments to their operating licenses to permit expansion of on-site capacity for the storage of spent nuclear fuel assemblies.

The crux of the case is current uncertainty about the prospects for developing and implementing safe methods for the ultimate disposal—or even long-term storage—of the highly toxic radioactive wastes created in the process of nuclear power generation.

In this opinion, we do not set aside or stay the challenged license amendments. On certain aspects of the case, we issue rulings approving the agency's procedural position. However, we conclude by remanding these cases to the agency for clarification and consideration in the light of a related proceeding and other current developments.

## I. BACKGROUND AND DECISION UNDER REVIEW

A nuclear reactor core contains a number of fuel assemblies, bundles of thin tubes (or "fuel rods") containing pellets of enriched uranium. The build-up of neutron-absorbing "poisons" during the chain reaction reduces the ability of the fuel to sustain an efficient chain reaction. "Spent" fuel assemblies must therefore be removed periodically from the reactor core and replaced with fresh fuel. When removed from the core, the assemblies generate enormous heat and contain highly radioactive uranium, actinides and plutonium. Under current practice, the assemblies are placed vertically on racks in a "spent fuel pool" adjacent to the reactor and within the containment vessel. The spent fuel pool is a large basin constructed of concrete, lined with stainless steel and filled with water to dissipate the heat generated by radioactive decay and to absorb radiation.

It was anticipated, when most of the nuclear power plants now in operation in the United States were licensed, that spent fuel would be stored at the reactor site only long enough to allow the fuel assemblies to cool sufficiently to permit safe shipment off-site for reprocessing (the extraction from the rods of usable uranium and plutonium) or

permanent disposal. Spent fuel storage capacity at these plants is therefore limited.

Plans for off-site reprocessing or storage have not materialized. No facility for reprocessing of commercial nuclear wastes is currently licensed; indeed, in 1977 President Carter suspended indefinitely all commercial reprocessing, because of security concerns about plutonium proliferation. The availability of off-site storage facilities, not involving reprocessing, is limited, and no additional capacity is currently projected.

Operators of nuclear plants have sought from the Nuclear Regulatory Commission license amendments permitting expansion of on-site spent fuel storage capacity. Otherwise, as is evident from the foregoing description, these nuclear plants, which were designed in contemplation of off-site shipment of spent fuel, would be forced to shut down when the limited on-site storage capacity was filled.

More specifically, these consolidated appeals involve two applications for license amendment. Vermont Yankee Nuclear Power Corporation, the intervenor in No. 78–2032, operates a nuclear generating facility at Vernon, Vermont. Its spent fuel pool had an original capacity of 600 fuel assemblies. Scheduled refuelings would have filled the pool by 1977, and forced Vermont Yankee to cease operation in August 1978. On November 5, 1976, Vermont Yankee applied to the NRC for an amendment to its operating license to permit expansion of the pool's capacity from 600 to 2000 assemblies, thereby permitting on-site storage through 1987. The application contemplated no increase in the physical dimensions of the pool, but rather the installation of new racks that would permit closer spacing of the fuel assemblies in the pool. The New England Coalition on Nuclear Pol-

lution (petitioner here) and others intervened.

Northern States Power Company, intervenor in No. 78–1269, operates the Prairie Island nuclear facility in Goodhue County, Minnesota. That facility has two reactors, which would have exhausted the 198-assembly capacity of their shared spent fuel pool by the spring of 1978, forcing the shutdown of both reactors by the spring of 1979. On November 24, 1976, Northern States requested that NRC grant an amendment to its operating license to permit expansion of the pool capacity to 687 assemblies, allowing storage through 1982.[1] Like Vermont Yankee, Northern States proposed to accomplish the expansion through closer spacing of racks within the pool. The Minnesota Pollution Control Agency intervened.

In separate proceedings on each application, the NRC Staff undertook evaluations of the safety of the proposed pool modifications and their environmental impact. The evaluations extended only to the safety and environmental effects of the proposed modifications themselves; the Staff did not consider any implications arising from the possibility that the unavailability of a permanent nuclear waste disposal solution might cause the plant sites to become permanent storage facilities, or even to continue on as storage beyond the expiration dates of the licensees' operating authority (for Vermont Yankee and Prairie Island, during the years 2007–2009).

Noting that the modification would entail no increase in the amount of wastes annually generated by the reactor, the Staff found "reasonable assurances" that the modifications would not endanger public health and safety, and hence satisfied the standards of the Atomic Energy Act and NRC regulations,[2] and concluded that the National En-

1. The projected dates for Vermont Yankee and Prairie Island assume retention of sufficient capacity in the pool to permit the temporary removal of all fuel assemblies from the reactor core to facilitate core maintenance. Use of this "off-load" capacity for storage of spent fuel assemblies, while undesirable from an engineering perspective, would extend the period of

available storage capacity another two or three years.

2. J.A. at 16 (Vermont Yankee); id. at 216 (Northern States); see 42 U.S.C. § 2133(d) (1976) (no license may be issued, if, in the opinion of the Commission, issuance would be "inimical to the common defense and security

vironmental Policy Act (NEPA) did not require the preparation of environmental impact statements because the modifications would not "significantly affect the quality of the human environment." [3]

The initial decision of the Licensing Board in each proceeding essentially adopted the Staff's safety and environmental findings and approved the requested amendments. 6 N.R.C. 436 (1977) (Vermont Yankee); 6 N.R.C. 265 (1977) (Prairie Island). Each Board excluded from its determination any consideration of the safety and environmental effects of long-term storage of nuclear wastes on the site. 6 N.R.C. at 438 (Vermont Yankee); J.A. at 172 (Prairie Island) (order following prehearing conference).

Petitioners appealed. The Appeal Board consolidated the appeals and affirmed. 7 N.R.C. 41 (Jan. 30, 1978).

The Appeal Board first noted that there was no serious challenge to the evidence supporting the Staff's and Licensing Boards' safety and environmental conclusions. It then addressed the different issue raised by the intervenors (petitioners here). Those parties contended that the uncertainty as to the feasibility of ultimate solutions for the disposal of commercial nuclear wastes raised the possibility that the reactor sites might become long-term and possibly indefinite storage sites, persisting subsequent to the expiration of the plants' operating licenses. Before any expansion of on-site storage capacity could be approved, they argued, the Commission must consider the safety and environmental implications of indefinite storage on-site after decommissioning of the reactor.

In deciding to what extent it was bound to take into account these long-term impli-

cations, the Appeal Board began with NEPA's "rule of reason" as to the possible consequences of an action that must be considered. That doctrine was first enunciated in *NRDC v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), *quoted with approval, Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The Board defined its inquiry not as whether it was "theoretically possible" that no off-site fuel repositories would be available at the expiration of the license; rather, it defined the question as whether that event was "reasonably probable." 7 N.R.C. at 49.

Although evincing uncertainty as to the conclusion it might reach on its own, the Board believed the question foreclosed by an earlier determination of the NRC.[4] The Board invoked an NRC decision denying a petition of the Natural Resources Defense Council that it initiate a rulemaking to determine "whether radioactive wastes can be generated in nuclear power reactors and subsequently disposed without undue risk to the public health and safety" and that it refrain from granting further operating licenses until such a "definite finding of safety" was made. 42 Fed.Reg. 34,391 (1977). The Commission premised its denial on its "reasonable confidence that wastes can and will in due course be disposed of safely." Pointing to what it called "a coordinated Federal program to develop an actual disposal facility," the Commission noted its "implicit finding of reasonable assurance that methods of safe permanent disposal of high-level wastes can be available when they are needed." *Id.* at 34,393. The Appeal Board recognized that the NRC's conclusion did not stem from a formal record

---

or to the health and safety of the public"); 10 C.F.R. § 50.57(a)(3) (1978) (license may be issued upon finding that "[t]here is reasonable assurance (i) that the activities authorized by the license can be conducted without endangering the health and safety of the public"); *see also* 10 C.F.R. § 50.91 (1978) (Commission guided in granting amendments to license by considerations entering into initial approval).

**3.** J.A. at 48 (Vermont Yankee); *id.* at 243 (Prairie Island); *see* National Environmental Policy Act, § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976).

**4.** Had we been compelled to come to grips with that question unaided, it is not certain what result might have been reached. It has turned out, however, that the Commission has spoken on the subject.

7 N.R.C. at 49.

developed in a rulemaking or adjudicatory proceeding. But it nonetheless gave effect to the ruling as "a policy declaration that, for the purposes of licensing actions, it both can and should be presumed that there will be spent fuel repositories available 'when needed'—*i. e.*, well before the termination of the Prairie Island or Vermont Yankee operating licenses." 7 N.R.C. at 51.

The NRC itself entered a simple order declining to review the Appeal Board's decision and providing no further reasoning or comment. In a separate statement, Commissioner Bradford attacked the Board's reasonable probability finding, because the conclusion of the NRC denial of rulemaking from which it was derived "was not based on or tested by any evidentiary hearing." J.A. at 121. Petitioners then sought review in this court.

## II. ANALYSIS

Petitioners renew the claims they advanced before the Appeal Board and the Commission.[5] They submit: Prior to the issuance of a license amendment permitting expansion of on-site storage capacity, the NRC must make a determination of probability that the wastes to be generated by the plants can be safely handled and disposed of. If no "off-site" solution (either an ultimate solution to the problem of waste disposal, or some interim solution involving storage facilities off the reactor site), is projected as probably available, the

NRC must take into account the safety and environmental implications of maintaining the reactor site as a nuclear waste disposal site after the expiration of the license term.

Petitioners do not take issue with the Appeal Board's conclusion that all that is required is a reasonable probability that a solution will be available when needed. They claim the Appeal Board erred in making its determination of reasonable probability not on the basis of evidence adduced on the record in the adjudicatory proceedings, but on the basis of the NRC's "declaration of policy" in its denial of rulemaking on the NRDC petition.

No one disputes that solutions to the commercial waste dilemma are not currently available. The critical issue is the likelihood (or probability) that solutions, either ultimate or interim, will be reached in time. Petitioners propound a number of theories for why the "fact" of this likelihood must be tested within the context of an adjudicatory proceeding and its evidentiary procedures. We do not consider these contentions in detail. We agree with the Commission's position that it could properly consider the complex issue of nuclear waste disposal in a "generic" proceeding such as rulemaking, and then apply its determinations in subsequent adjudicatory proceedings. Where factual issues do not involve particularized situations, an agency may proceed by a comprehensive resolution of

---

**5.** The Minnesota Pollution Control Agency makes an additional argument. It contends that NRC violated NEPA by improperly "segmenting" its consideration of the environmental impact of expansion of onsite storage capacity at Prairie Island. The theory is that because the present expansion of the spent fuel pool will accommodate the spent fuel assemblies produced at Prairie Island only until 1982, a request for further expansion is inevitable. Citing *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), Minnesota argues that the NRC was required to take into account the environmental impact of this "unavoidable consequence" of the current expansion.

We find this argument without substance. Minnesota has not pointed to any consequence of future expansion that could not be adequately considered at the time of any requests for

further expansion. Indeed, the NRC Staff in its environmental impact analysis of the proposed expansion expressly considered five factors articulated by the NRC for consideration of individual license amendment applications pending preparation of a generic EIS on the question of interim on-site storage of spent fuel assemblies. *See* 40 Fed.Reg. 42,802 (1975). The Staff specifically found that the licensing action here would not foreclose alternatives available with respect to other licensing actions designed to ameliorate a possible shortage of spent fuel capacity (noting that "taking this action would not necessarily commit the NRC to repeat this action or a related action") and that addressing the environmental impact associated with the proposed licensing action would not overlook any cumulative environmental impacts. J.A. at 239–42.

the questions rather than relitigating the question in each proceeding in which it is raised. *Ecology Action v. AEC*, 492 F.2d 998, 1002 (2d Cir. 1974) (Friendly, J.); *see American Airlines, Inc. v. CAB*, 123 U.S. App.D.C. 310, 359 F.2d 624 (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Petitioners hypothesize the need for individualized determinations, but we think it clear that the central issue posed by petitioners—the feasibility of interim or ultimate nuclear waste disposal solutions—is one essentially common to all nuclear facilities.

Petitioners fear that determination of the question in a "generic" proceeding, which would proceed as a rulemaking rather than adjudication, will deprive them of procedures, such as cross examination, to test the evidence underlying the probability determination that would be afforded by an adjudication. We do not dictate the procedures of the "generic" proceeding. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The breadth of the questions involved and the fact that the ultimate determination can never rise above a prediction suggest that the determination may be a kind of legislative judgment for which rulemaking would suffice.

In its decision, the Appeal Board relied on the NRC's denial of NRDC's rulemaking request. The NRC's decision was one of statutory interpretation, concluding that Congress did not intend in enacting the Atomic Energy Act to require a demonstration that nuclear wastes could safely be disposed of before licensing of nuclear plants was permitted. The Second Circuit affirmed on this basis. *NRDC v. NRC*, 582 F.2d 166 (2d Cir. 1978). Thus, the NRC in its denial of rulemaking chose not to undertake the kind of comprehensive inquiry into the question of disposal solutions that would be required to give content to a "generic" determination. NRC did state its "reasonable confidence" that solutions would be available when needed. While based on a description of current federal efforts in the area, NRC's "assurances" are not the product of a rulemaking record devoted expressly to considering the questions.[6] Further, that proceeding did not address the particular problem focused by petitioners—that even if ultimate disposal solutions will be found, they will not be available before the expiration of the plants' operating licenses.

■ We need not consider what course we would have followed if this were all that were before us. As is clear from the records of this court, and as confirmed by counsel, there is now pending before the Commission a related generic proceeding— the so-called "S–3" proceeding, in which the issues of the storage and disposal of commercial nuclear wastes are of central concern. That proceeding commenced in 1972 when the Commission's predecessor (the Atomic Energy Commission) proposed rulemaking to reconsider whether the environmental effects of the uranium fuel cycle should be included in the cost/benefit analysis prepared in licensing each nuclear plant. Although concluding that the environmental effects of the fuel cycle were "relatively insignificant," the Commission found it preferable to take them into account. It promulgated its rule as "Table S–3,"[7] which specified a series of numerical values intended to represent the incremental contribution of one nuclear reactor to the total environmental impact of the uranium fuel cycle. *See NRDC v. NRC*, 178

---

6. *Cf. NRDC v. NRC*, 178 U.S.App.D.C. 336, 361, 547 F.2d 633, 658 (1976) (Tamm, J., concurring in result) ("NEPA requires the Commission fully to assure itself that safe and adequate storage methods are technologically and economically feasible. It forbids reckless decisions to mortgage the future for the present, glibly assuring critics that technological advancement can be counted upon to save us from the consequences of our decisions"). As appears below, the Supreme Court, in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), reversed the ruling of the majority opinion requiring further procedures but remanded for the kind of inquiry called for in Judge Tamm's concurring opinion.

7. The current, "interim," Table S–3 appears in 10 C.F.R. § 51.20(e) (1978).

U.S.App.D.C. 336, 345, 547 F.2d 633, 642 (1976), *reversed sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

In reaching its conclusion that the environmental impact was "relatively insignificant," the Commission relied substantially on testimony of agency personnel that the as-yet unsolved problems of ultimate disposal of nuclear wastes would be resolved. *Id.* at 349–56, 547 F.2d at 646–53. This reliance was challenged on judicial review. While the Supreme Court reversed this court's holding that NRC's procedures were inadequate, *Vermont Yankee, supra,* 435 U.S. at 539–48, 98 S.Ct. 1197, it did not disapprove the view expressed by Judge Tamm in his concurring opinion, *NRDC v. NRC, supra,* 178 U.S.App.D.C. at 361–64, 547 F.2d at 658–61, and remanded to this court to permit a determination whether the administrative record contained sufficient evidence to support the NRC's finding. 435 U.S. at 549, 98 S.Ct. 1197.

On remand, this court has held in abeyance its review of the original S–3 rulemaking, as well as that of an "interim" rule now before the court, pending completion of NRC proceedings to promulgate a new fuel cycle rule. At oral argument, NRC counsel informed the court that this new final fuel cycle rule is pending before the Commission. Counsel also told the court that the current feasibility and likelihood of implementation of nuclear waste disposal solutions was a matter contested in the hearings on the new final rule.

It would be inappropriate for this court to ignore the relevance of proceedings in which some of the basic questions raised now are the subject of current exploration. Since the disposition of the S–3 proceeding, though it has a somewhat different focus,[8] may have a bearing on the pending cases, and being advised of recent developments[9] that raise new issues about the feasibility of disposal solutions, we think it appropriate in the interest of sound administration to remand to the NRC for further consideration in the light of its S–3 proceeding and analysis. In particular, the court contemplates consideration on remand of the specific problem isolated by petitioners—determining whether there is reasonable assurance that an off-site storage solution will be available by the years 2007–09, the expiration of the plants' operating licenses, and if not, whether there is reasonable assurance that the fuel can be stored safely at the sites beyond those dates. We neither vacate nor stay the license amendments, which would effectively shut down the plants.

At oral argument intervenors Vermont Yankee and Northern States stressed the argument that the court has no legitimate basis for concerning itself with issues of ultimate waste disposal in the context of the public health and safety standard of the Atomic Energy Act. The Appeal Board did not deem these concerns irrelevant, but it held that an analysis was required only where it was "reasonably probable" that solutions would not be reached. The question is whether there has been an NRC disposition in generic proceedings that is adequate to dispose of the objections to the licensing amendments.

Intervenors rely on *NRDC v. NRC,* 582 F.2d 166 (2d Cir. 1978). The Second Circuit found that Congress was well in-

---

8. The on-going S–3 proceedings have focused *only on the issue arising under NEPA, as to the* environmental impact of nuclear waste disposal, and not on the effect of the uncertainty as to solutions under the public health and safety standard for licensing under the Atomic Energy Act, which NRC counsel acknowledged is more rigorous than NEPA standards in certain aspects. And the S–3 proceedings may not be concerned with the more limited issue identified in the pending cases of whether offsite storage solutions will be available prior to the expiration of the operating certificates.

9. At oral argument counsel for petitioner New England Coalition told the court of a final Report to the President by the Interagency Review Group on Nuclear Waste Management, issued March 19, 1979, that casts some doubt on whether current proposed solutions to the permanent waste disposal problem are technologically feasible. *Id.* at 42. The Report also pointed to gathering institutional problems, *e. g.,* the resistance of localities to storage of wastes within their jurisdictions, that "may well be more difficult than finding solutions to remaining technical problems." *Id.* at 87–88.

formed that disposal solutions were not currently feasible, yet it permitted continued licensing of nuclear plants. We do not read that opinion, however, to hold as a matter of law that storage and disposal concerns are never relevant to the licensing of nuclear plants. Rather, as the NRC itself recognized, Congress has chosen to rely on the NRC's (and its predecessor's) assurances of confidence that a solution will be reached. *See* 42 Fed.Reg. at 34,392. There is no implication that Congress intended that the NRC ignore new knowledge or analysis in its licensing decisions. As the Supreme Court implicitly recognized by remanding for a review of the sufficiency of the S-3 evidence in *Vermont Yankee, supra,* 435 U.S. at 549, 98 S.Ct. 1197, this court does not exceed its judicial province by inquiring into the basis of those assurances of confidence. As Commission counsel rightly notes, it is for the Commission to decide the ultimate question of certainty implicit in health and safety judgments and to resolve technical disagreements, but that is not to say that these matters are totally immune from judicial review.

### III. CONCLUSION

The court confines its action at this time to rejection of certain contentions by petitioners, notably the claim of need for an adjudicatory proceeding. We agree with the Commission that it may proceed in these matters by generic determinations. The complex and vexing question of the disposal of nuclear wastes is a matter that is currently before the Commission in a related proceeding, and is characterized by continuing evolution of the state of pertinent knowledge. Accordingly we remand the balance of these cases, and issues raised, for further consideration by the Commission with such procedure as it may deem appropriate.[10]

*So ordered.*

10. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543–44, 98 S.Ct. 1197 (1978). The Commission may integrate the issues with the pending S-3 proceeding, designate a follow-on generic proceeding, or follow such other courses as it deems appropriate.

TAMM, Circuit Judge, concurring:

The Nuclear Regulatory Commission[1] ruled that prior to approval of a license amendment permitting expansion of a nuclear plant's spent fuel pool capacity, there must be a determination concerning future spent fuel storage. Specifically, there must be a determination whether it is reasonably probable that an offsite fuel repository will be available when the operating license of the nuclear plant in question expires. We remand this case to the Commission for appropriate proceedings devoted to determining whether such a reasonable probability exists.

Although I concur in the court's opinion, I write separately to emphasize my belief that section 102(2)(C) of the National Environmental Policy Act of 1969[2] and section 103(d) of the Atomic Energy Act of 1954[3] mandate the determination that the Commission identified in this case. In addition, if the Commission determines it is not reasonably probable that an offsite waste disposal solution will be available when the licenses of the plants in question expire, it then must determine whether it is reasonably probable that the spent fuel can be stored safely onsite for an indefinite period. Answers to these inquiries are essential for adequate consideration of the safety and environmental standards of the relevant statutes. It is undisputed that questions involving storage and disposal of nuclear waste pose serious concerns for health and the environment. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 538–39, 98 S.Ct. 1197, 1208–09, 55 L.Ed.2d 460, 475–76 (1978).

This interpretation of the relevant statutes is consistent with the recent decision of the Second Circuit in *NRDC v. NRC,* 582 F.2d 166 (2.d Cir. 1978). The court of ap-

1. The decision was rendered by the Commission's Atomic Safety and Licensing Appeal Board.

2. 42 U.S.C. § 4332(2)(C) (1976).

3. 42 U.S.C. § 2133(d) (1976).

peals in that case held that the Commission need not halt licensing of nuclear plants pending a determination that an approved method of permanent nuclear waste disposal exists. The Second Circuit decided that congressional intent is satisfied by a reasonable assurance that a safe method for permanent disposal of wastes will be available when needed. *See id.* at 171–75. Our opinion merely remands this case to the Commission for such proceedings as it deems appropriate to determine whether there is reasonable assurance that an offsite storage solution will be available when needed—in this case, by the years 2007–2009.