606 F.2d 1363
 196 U.S.App.D.C. 456, 9 Envtl. L. Rep. 20,626
 PORTER COUNTY CHAPTER OF the IZAAK WALTON LEAGUE OF AMERICA,
INC., et al., Petitioners,
v.
The NUCLEAR REGULATORY COMMISSION and the United States of
America, Respondents,
Northern Indiana Public Service Co., Intervenor.
The PEOPLE OF the STATE OF ILLINOIS, Petitioner,
v.
The NUCLEAR REGULATORY COMMISSION and the United States of
America, Respondents,
Northern Indiana Public Service Co., Intervenor.
The CITY OF GARY, INDIANA, Petitioner,
v.
The UNITED STATES NUCLEAR REGULATORY COMMISSION and the
United States of America, Respondents,
Northern Indiana Public Service Co., Intervenor.
The LAKE MICHIGAN FEDERATION, Petitioner,
v.
The UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Northern Indiana Public Service Co., Intervenor.
 Nos. 78-1556, 78-1559 to 78-1561.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 7, 1979.
Decided Sept. 6, 1979.
 
 Robert J. Vollen, Atty., Chicago, Ill., with whom William J. Scott, Atty. Gen. of the State of Illinois, Robert L. Graham, Atty., Russell R. Eggert, Dean Hansell, Susan N. Sekuler, Asst. Attys. Gen., and Richard L. Robbins, Atty., Chicago, Ill., were on the brief for petitioners.
 Peter G. Crane, Atty., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom James L. Kelley, Acting Gen. Counsel, Stephen F. Eilperin, Sol., Anthony C. Liotta, Acting Asst. Atty. Gen., and Nancy Firestone, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 Charles A. Horsky, Atty., Washington, D. C., with whom Maurice Axelrad, Washington, D. C., were on the brief for intervenor Northern Indiana Public Service Company.
 Michael I. Swygert, Atty., Chicago, Ill., also entered an appearance for appellant The City of Gary, Indiana in case No. 78-1560.
 Before LEVENTHAL, ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge LEVENTHAL.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These petitions for review filed by environmental and citizen groups and state and local governments[1] bring to this court a challenge to the procedure by which the Nuclear Regulatory Commission (NRC) passes on a request to institute an adjudicatory proceeding to suspend and revoke a permit to construct a nuclear power plant.
 
 
 2
 The Director of Nuclear Reactor Regulation rejected requests to initiate a proceeding to revoke the construction permit granted to Northern Indiana Public Service Company (NIPSCO, or the Company) for its Bailly Nuclear Generating Facility. The requesting parties filed a petition for review with the Commission.[2] On April 20, 1978, the Commission entered a memorandum and order declining to disturb the Director's determination. Petitioners challenge this order on two grounds. They assert that the Atomic Energy Act of 1954[3] (the Act) requires that the Commission institute a proceeding whenever evidence not available when the construction permit was issued casts serious doubt on the safety of reactor design. They further contend that the discretion whether to institute such a proceeding may not be lodged in the NRC staff, which participated in the initial construction permit proceedings in favor of the application, as this violates due process as an impermissible combination of functions. Finding the Commission's procedure to comport with statutory and constitutional requirements, we affirm.
 
 
 3
 * The Company applied in 1971 for a construction permit for its Bailly facility, to be located on the southern shore of Lake Michigan near Gary, Indiana.[4] Following safety and environmental reviews, the Commission staff took the position in hearings before the Atomic Safety and Licensing Board that the application should be approved. Following favorable Board action, the permit was issued on May 1, 1974.
 
 
 4
 As of August 31, 1978, the construction of the Bailly facility was less than one percent complete.[5] The issuance of the permit led to litigation in the Seventh Circuit by three petitioners now before this court, with successful requests for stay of construction Pendente lite.[6]
 
 
 5
 In November and December, 1976, shortly after the termination of the Seventh Circuit litigation by the Supreme Court's denial of certiorari, the Requests underlying the present petitions for review were filed with the NRC. They alleged that "new facts, new evidence, and legal developments" occurring since the issuance of the permit now required its revocation.[7] Among these new developments were changes in construction costs, fuel costs, fuel availability, the Company's financial strength and the anticipated need for the power to be generated at Bailly, as well as intervening legislation, court decisions and government reports. The allegation now being highlighted (though it was not prominent in the Requests) is the claim that new evidence raised substantial questions concerning the ability of the General Electric Mark II reactor's containment vessel to withstand the pressures generated in certain types of nuclear accidents.[8] The source material for this contention came from the staff itself, which, in letters to the Company, had indicated that design problems might be present. The staff had initiated its inquiry when General Electric advised the Commission in 1975 that new tests had raised the concern that it had previously underestimated the forces which might be exerted on its Mark II containment under certain conditions.
 
 
 6
 The Requests were referred to the Director of Nuclear Reactor Regulation and rejected on April 15, 1977. As to the safety question, the Director noted that the NRC staff was pursuing the matter on a generic basis with General Electric and the utilities which proposed to construct reactors with the Mark II containment. He accepted the staff's conclusion that NIPSCO's response to staff inquiries, which adopted General Electric's responses, were adequate at the construction permit stage. Any unresolved problems could still be considered at the proceedings for operating licenses for Bailly and the other facilities. J.A. at 17-21.
 
 
 7
 In its April 20, 1978, memorandum the Commission rejected the objection based on the NRC staff's participation as a party adversary to petitioners in the construction permit proceedings. 7 N.R.C. 429 (1979). Because the Director's consideration of the petitions was not an adjudication, the separation-of-function prohibitions of the Administrative Procedure Act (APA)[9] and Commission regulations[10] did not apply. The Commission found petitioners' implicit premise that the staff's position prior to issuance of a construction permit rendered it incapable of impartial regulation following issuance of the permit to be "contradicted by the structure of nuclear regulation established by the Atomic Energy Act and by twenty years experience implementing that statute." The Commission also dismissed claims that the Director's decision was procedurally defective:
 
 
 8
 Contrary to petitioners' assertions, he is not required to accord presumptive validity to every assertion of fact, irrespective of its degree of substantiation, or to convene an adjudicatory proceeding in order to determine whether an adjudicatory proceeding is warranted. Rather, his role at this preliminary state is to obtain and assess the information he believes necessary to make that determination. Provided he does not abuse his discretion, he is free to rely on a variety of sources of information, including staff analysis of generic issues, documents issued by other agencies, and the comments of the licensee on the factual allegations. Once that inquiry and assessment have been made, the standard to be applied in determining whether to issue a show cause order is . . . whether "substantial health or safety issues (have) been raised. . . . (A) mere dispute over factual issues does not suffice."
 
 
 9
 Id. at 432-33, Quoting Consolidated Edison Co., 2 N.R.C. 173, 176 (1975). Finding no abuse of discretion, the Commission declined to disturb the Director's ruling.
 
 II
 
 10
 We do not accept petitioners' contention that the Act mandates the institution of proceedings to suspend and revoke the construction permit whenever evidence not available at the initial permit proceedings raises " serious, unresolved safety questions." Pet. Brief at 29.
 
 
 11
 We do not understand the Commission to deny the basic relevance of safety considerations in deciding whether to institute proceedings, nor to claim unfettered discretion under the Act to choose not to institute proceedings. Rather, the Commission asserts that the nature of the requisite safety showing is shaped by the requirements of the statute and that the determination whether the safety questions raised necessitate initiation lies, in the first instance, within the discretion of the Commission's enforcement arm, the NRC staff.
 
 
 12
 Petitioners point to two sections of the Act in support of their position. Section 186 of the Act,[11] provides that any license, including a construction permit, may be revoked for reasons "which would warrant the Commission to refuse to grant a license on an original application." The section also makes the formal adjudication procedures of the Administrative Procedure Act applicable to any revocation proceeding.[12] Section 189(a) permits any interested party to demand a hearing in a revocation proceeding.[13] These sections define the substantive standards and the procedures that govern a proceeding once it is begun. They do not define the conditions under which a proceeding must be instituted.
 
 
 13
 Petitioners also cite certain snippets of legislative history for the proposition that Commission proceedings are to be conducted in the open.[14] That history, however, only explains and fortifies the requirement that such proceedings as are begun shall be formal, public hearings. It does not specify when those proceedings must be initiated.
 
 
 14
 The subject of initiation of proceedings is covered by Commission regulations and decisions. The regulations lodge in the various staff directors (E. g., the Director of Nuclear Reactor Regulation) authority to initiate show cause proceedings to modify, suspend or revoke any license. 10 C.F.R. § 2.202 (1979). The regulations also provide that any person may request the appropriate director to institute a proceeding. The requesting person must specify the action he seeks and set forth facts forming the basis of the request. The Director must respond within a reasonable time, either by initiating a proceeding or by advising the requesting person of his reasons for not doing so. Id. § 2.206.
 
 
 15
 The Commission has interpreted § 2.206 to require issuance of a show cause order when "substantial health or safety issues" have been raised. Consolidated Edison Co., 2 N.R.C. 173, 176 (1975). As the Commission's brief indicates, the nature of the showing of substantiality depends upon the requirements of the outstanding license. This discriminating approach fairly reflects the statutory standard providing for revocation for reasons which "would warrant the Commission to refuse to grant a license or an original application."
 
 
 16
 Under this analysis, the presence of unresolved safety issues does not require revocation of a construction permit. In Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 398, 81 S.Ct. 1529, 1530, 6 L.Ed.2d 924 (1961), the Supreme Court rejected the proposition that the Atomic Energy Act required the Commission to make "the same definitive finding of safety of operation as it admittedly will have to make before it licenses actual operation of the facility." Thus, while a utility must demonstrate "reasonable assurances" that a proposed plant can be operated safely before it may obtain an operating license, 10 C.F.R. § 50.57(a)(3) (1979), the unresolved safety questions do not require denial of a construction permit. NRC regulations require only a "reasonable assurance" that the safety questions will be resolved prior to completion of construction. That finding must be based on a judgment that the technical information needed will be available in time, when the final safety analysis report is prepared at the operating license stage, and that the utility has begun the research and development necessary to resolve the safety problem. Id. § 50.35(a) (1979).
 
 
 17
 Generally speaking, the law gives agencies wide discretion to determine the means of administration of pertinent regulatory standards, the techniques of interpretation, application, filling in of details, and enforcement.[15] The agency is not bound to launch full-blown proceedings simply because a violation of the statute is claimed. It may properly undertake preliminary inquiries in order to determine whether the claim is substantial enough under the statute to warrant full proceedings. The appropriate agency official has substantial discretion to decline to initiate proceedings based on this review, at least where, as here, he gives reasons for denying or deferring a hearing.[16] The NRC procedure here accords with these precepts.
 
 
 18
 We find no conflict in this result with EDF v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971). This court there held that the Secretary of Agriculture could not refuse to institute formal administrative proceedings to suspend or cancel the registration of the pesticide DDT once he determined that "a substantial question about the safety" of the pesticide was present. But the court recognized that it was for the Secretary to make the initial determination as to the existence of "a substantial question" of safety and specifically noted that he could "of course, conduct a reasonable preliminary investigation before taking action under the statute." Id. at 85, 439 F.2d at 595. EDF v. Ruckelshaus found a duty to begin proceedings, once the Secretary found substantial safety questions, in view of the current and imminent dangers to the public health of allowing continued use of an unsafe pesticide. In the case of a construction permit for a nuclear power plant, however, permitting continued construction of the plant despite unresolved safety questions does not of itself pose any danger to the public health and safety. Before the license is granted to operate the plant there will be adjudication proceedings. Any interested party may request a hearing. In such an operating license proceeding unresolved safety questions will be considered. A positive finding of reasonable assurance of safety is a prerequisite to issuance of the operating license. We do not ignore appellees' fear that the inertia generated by completion of a nuclear plant, with the massive investment it represents, will sway the licensing authority from faithfully carrying out its mandate to protect the public safety, if necessary by denying an operating license. While that contention may have practical force in some instances, a court may not transform a projected tendency to inertia into a presumption of infidelity to duty. See Power Reactor, supra, 367 U.S. at 414-16, 81 S.Ct. 1529. It is not the public, but the utility, that must bear the risk that safety questions it projects will be resolved in good time, may eventually prove intractable and lead to the denial of the operating license.
 
 
 19
 In this case, the Director recognized the seriousness of the design problems identified in the Mark II containment. As already noted, the staff had begun its consideration of the problem before petitioners incorporated a reference to it in their revocation requests. Based on the continuing generic effort by the staff to ensure resolution of the problem by General Electric and the utilities,[17] the Director found no contradiction of the standards of 10 C.F.R. § 50.35(a), requiring reasonable assurance of a resolution. The record before us does not establish that the actions of the staff thus far were other than a conscientious response to the problems that have been identified.
 
 
 20
 The challenge by petitioners is in procedural terms that since the safety question had not yet been resolved a hearing was required now, I. e. in a revocation proceeding. Before an initial construction permit can be transformed into an operating license there is a procedure for public hearing, and challenge to any safety questions that have not been resolved. In the context of this case, the Director and Commission did not abuse their discretion in failing to require an interim public hearing in a proceeding to revoke the initial construction permit.
 
 III
 
 21
 We turn to petitioners' allegations of impropriety in allowing the Director of Nuclear Reactor Regulation to dispose of the requests for institution of revocation proceedings. Petitioners contend that the NRC staff (and, by extension, the Director) are inherently biased due to the staff's earlier advocacy of the Bailly construction permit and its continuing investigatory function. Petitioners have dropped the claim made at the administrative level that the Commission's procedures are prohibited by the APA's strictures against combination of decisionmaking and prosecutorial or investigative functions.[18] That provision applies only to formal adjudications.[19] But petitioners nonetheless assert a violation of due process guarantees because "the Staff has acted as the judge of its own case." Pet. Brief at 22.
 
 
 22
 Even as to adjudications, the combination in one administrative body of adjudicative with other functions violates constitutional guarantees only when the combination "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). See also Hortonville Joint School District No. 1 v. Hortonville Education Ass'n, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); FTC v. Cement Institute, 333 U.S. 683, 700-03, 68 S.Ct. 793, 92 L.Ed. 1010 (1947). Any claim of inherent bias must "overcome a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. at 47, 95 S.Ct. at 1464. In Withrow, the Court rejected due process contentions where a state professional licensing board had exercised both investigatory powers and the power to suspend a license based on the facts developed by the investigation. The Court's decision reflected keen awareness of the substantial problems raised by combination of functions, but also the perception that solutions could not be confined by a rigid rule:
 
 
 23
 (L)egislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety and complexity of the administrative processes have made any one solution highly unlikely.
 
 
 24
 Id. at 51, 95 S.Ct. at 1467.
 
 
 25
 There are contexts in which even in a formal rulemaking proceeding, sibling to an adjudicatory proceeding, an official with judicial responsibilities may have access to assistance from the staff. Hercules, Inc. v. EPA, 194 U.S.App.D.C. 172, 598 F.2d 91 (1978). But we do not pursue that line of doctrine, for it is a key feature of this case that the members of the staff who are petitioners' target were neither judicial officers nor making the decisions in adjudicatory proceedings. For this reason we find totally inapplicable the cases cited by petitioners in which an individual member of a body making the decision in an adjudicatory proceeding was disqualified because of prior participation in the matter in an investigatory or adversary role. American Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966); Amos Treat & Co. v. Sec, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962); Trans World Airlines v. CAB, 102 U.S.App.D.C. 391, 254 F.2d 90 (1958). Without stating whether this was legally required, we take note that in the very case before us NRC Commissioner Rowden recused himself from participation in the Commission's order of April 20, 1978, because he had been a member of the NRC staff in the Bailly construction permit proceedings.
 
 
 26
 The contention of petitioners is evocative of a monolithic assumption that once members of a staff have taken a position, (a) their view is forever fixed and (b) it will infect other members of the agency with regulatory responsibilities. As appears from Withrow v. Larkin, however, there is a distinction between claims of "structural" bias, against which there is a strong presumption, and individual bias. See 421 U.S. at 50-51 n. 16, 95 S.Ct. 1456. And Withrow dismissed the due process objection even where functions were combined in a body composed of the same persons.
 
 
 27
 Petitioners distort matters by assuming that the decision whether to institute proceedings is a "contested matter" in which the Director acts as the "judge." Such a view does not take account fully of the manifold activities of the staff. The staff's functions occupy a broad range, encompassing preliminary investigations of license applications, participation in licensing proceedings, monitoring compliance following issuance of the license, and, if necessary, initiation of enforcement procedures. The common denominator is the application of expertise to a preliminary sizing up of a situation before a procedure is set in train to culminate in a decision in an adjudicative proceeding by an independent decisionmaker. There is no requirement of the duplication of staffs for each of these preliminary functions. The limited number of available experts might preclude such a course in any event. But there is more to it than that. The point is that the various preliminary functions are interrelated and their efficient discharge is aided by staff's familiarity with developing situations. The staff's expertise is central and integrative. This is an inherent part of the concept of agency expertise.
 
 
 28
 The importance of having the benefit of this expertise does not disappear simply because a petition seeking agency action is filed; at all points, the staff's preliminary judgment remains vital to effective regulation. Petitioners do not deny the relevance of these factors; indeed, they endorse the role of the staff in licensing and enforcement except for the particular circumstances where a request for staff reconsideration in the light of new evidence is made by outsiders. Whether the reexamination is triggered from within or outside the agency, the essential nature of the staff's function is the same; to undertake a preliminary investigation and reach a judgment, based on the application of administrative knowledge and expertise, as to whether action is required. The law does not require that the Commission be deprived of staff administration because of the speculation that a judgment of the past may preempt the future.[20] The due process clause makes a basic assumption of intellectual integrity in assessing a whole record in the light of new information. So far as appears, the context of this Act and experience under it, is consistent with that assumption;[21] nothing before us requires a special legal barrier to the staff's role.
 
 
 29
 The NRC staff has responded to the safety concerns that were initially identified by the manufacturer. The safety questions will ultimately be tested in adjudicative proceedings when the operating license is under consideration. That is the safety-assuring procedure that Congress has devised after due reflection. We have been cautioned against projecting a legislative intent to insert additional procedural requirements in the field of atomic energy regulation, notwithstanding the transcendent importance of the subject-matter, because this is a field that receives the intense and continuing attention of the legislators and their staffs, and the courts must give particular deference to the legislative balancing of the substantive and procedural considerations. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). As to the constitutional contentions of petitioners, the principles already announced by the Court are dispositive. We are unpersuaded by petitioners' statutory and constitutional claims that the Commission must move at once either to conduct a proceeding to revoke the construction permit or to assign that problem to a different staff for consideration.
 
 
 30
 Affirmed.
 
 
 
 [1]
 In addition to the parties named in the caption, the petition in No. 78-1556 is joined by Concerned Citizens Against Bailly Nuclear Site, Inc., Businessmen for the Public Interest, Inc., and three named individuals
 
 
 [2]
 By a rule change adopted after the filing of these petitions, the Commission no longer entertains petitions for review of denials of enforcement requests. 42 Fed.Reg. 36239-40 (1977) (Codified at 10 C.F.R. § 2.206(c)(2) (1979))
 
 
 [3]
 Pub.L. No. 83-703, 68 Stat. 919
 
 
 [4]
 The complex process established by the Atomic Energy Act and NRC regulations for the licensing of commercial nuclear electrical generating facilities has often been described. See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 525-27, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 403-07, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). Briefly outlined, a utility seeking to build and operate a nuclear plant must first obtain from the NRC a construction permit and then, once construction is complete, an operating license. In the construction permit step, an initial filing by the utility is followed by a rigorous safety analysis by both the Commission staff and the Advisory Committee on Reactor Safeguards, an independent body. The staff also undertakes the environmental review required by the National Environmental Policy Act. An Atomic Safety and Licensing Board then conducts an adjudicatory hearing, and renders a decision which is appealable to the Atomic Safety and Licensing Appeal Board. Essentially the same procedure is repeated when the utility applies for an operating license
 
 
 [5]
 Nuclear Regulatory Commission, NUREG 0030, Construction Status Report: Nuclear Power Plants, vol. 1, no. 9, pt. 1, at 4 (Sept. 1978)
 
 
 [6]
 Porter County Chapter of Izaak Walton League of America, Inc. v. AEC, 515 F.2d 513 (7th Cir. 1975), set aside the Commission's decision on a ground unrelated to the issues now pending. The Supreme Court reversed and remanded. 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975). On remand, the Commission order was upheld, 533 F.2d 1011 (7th Cir. 1976), Cert. denied, 429 U.S. 945, 97 S.Ct. 366, 50 L.Ed.2d 316 (1976). The Seventh Circuit's stay pending judicial review was entered on October 16, 1974, when only preliminary excavation work had been done
 
 
 [7]
 E. g., Supp. App. at 14 (petition of Porter County Chapter et al.)
 
 
 [8]
 The recent incident at the Three Mile Island facility in Pennsylvania has made common knowledge of the function of the reactor containment vessel. The Mark II containment resembles a cone sitting atop a cylinder. The cone, filled with air, houses the reactor core, where the nuclear chain reaction boils water and produces steam to turn turbines that generate electricity. The cylinder is half-filled with water, creating a "pressure suppression pool" that would be used to condense steam and absorb energy in the event of a nuclear accident. In a "loss of coolant accident," such as the rupture of a pipe, steam would be released into the cone, from which it would flow through a large number of pipes into the suppression pool. Similarly, an accident causing the shutdown of a turbine would necessitate the diversion of the pressurized steam driving the turbine. In that case, "safety release valves" located within the cone on the main steam line would open, and the steam would be piped into the pool. In both situations, the interaction of gases and water would exert forces on the containment structure. What precipitated the present concern was the discovery by General Electric during testing of a New Mark II model that it had previously underestimated the pressures that might be generated in those situations
 
 
 [9]
 5 U.S.C. § 554 (1976)
 
 
 [10]
 10 C.F.R. § 2.719 (1979)
 
 
 [11]
 Section 186(a) provides:
 Any license may be revoked for any material false statement in the application or any statement of fact required under section 2232 of this title, or because of conditions revealed by such application or statement of fact or any report, record, or inspection or other means which would warrant the Commission to refuse to grant a license on an original application, or for failure to construct or operate a facility in accordance with the terms of the construction permit or license or the technical specifications in the application, or for violation of, or failure to observe any of the terms and provisions of this chapter or of any regulation of the Commission.
 42 U.S.C. § 2236(a) (1976).
 
 
 [12]
 Section 186(b) provides that section 558(c) of the APA, 5 U.S.C. § 558(c) (1976) shall apply to revoking any license. Section 558(c) provides, in truth, that an agency shall adhere to the procedures for adjudications specified in 5 U.S.C. §§ 556, 557 (1976) for any revocation proceeding, and also requires additional procedures, such as according the licensee the opportunity to rectify the difficulties that caused institution of the revocation proceeding
 
 
 [13]
 42 U.S.C. § 2239(a) (1976)
 
 
 [14]
 See 100 Cong.Rec. 9999-10000, 10002 (1954); 103 Cong.Rec. 4093-94 (1957)
 
 
 [15]
 As the Supreme Court has recently emphasized with reference to agency choice of procedures:
 Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.
 Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).
 
 
 [16]
 See Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); Northern California Power Agency v. FPC, 168 U.S.App.D.C. 288, 292, 514 F.2d 184, 188 (1975); City of Lafayette, Louisiana v. SEC, 147 U.S.App.D.C. 98, 454 F.2d 941 (1971), Aff'd sub nom. Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973)
 The result we reach here is congruent with that of the Seventh Circuit in Illinois v. NRC, 591 F.2d 12, 13-16 (7th Cir. 1979).
 
 
 [17]
 The staff has undertaken separate programs for each of the problems identified, See note 5 Supra. The initial programs are described in a report to Congress, Nuclear Regulatory Commission, NUREG 0410, NRC Program for the Resolution of Generic Issues Related to Nuclear Power Plants (Jan. 1, 1978). As to the "loss of coolant" problem, the staff prescribed an immediate program to identify the maximum possible pressures that an accident might generate, and to develop conservative "design criteria" to handle such loads. A long-term program will seek more refined knowledge of possible loads, so that later plants using Mark II containments will not have to be over-designed for safety. Task No. A-8, at 1-2. As to the "safety release valve" problem, the report describes programs directed at four separate technical issues relating to the problem. Task No. A-39. A more recent report, NUREG 0487, Mark II Containment Lead Program Load Evaluation and Acceptance Criteria (Oct. 1978), details the results of the short-term program for the loss of coolant problem. The report concludes that sufficient information exists to establish conservative loads for the individual Mark II facilities nearing completion. It recounts the modifications undertaken to meet the problem, including reinforcement of containment structures, and redesign of various piping and equipment in the pressure suppression pool and other systems. Id. at 11-15. Because of its incomplete state, Bailly will presumably benefit also from the products of the long-term program
 Cf. Minnesota v. NRC, 195 U.S.App.D.C. 234, 602 F.2d 412 (1979) (no need for individual adjudications of issues that may appropriately be resolved in generic proceedings).
 
 
 [18]
 5 U.S.C. § 554 (1976)
 
 
 [19]
 E. g., Hercules, Inc. v. EPA, 194 U.S.App.D.C. 172, 198, 598 F.2d 91, 117 (1978)
 
 
 [20]
 Cf. Richardson v. Perales, 402 U.S. 389, 410, 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971) (separation of functions claim "assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity")
 
 
 [21]
 The Staff has in fact recommended the institution of proceedings to revoke a construction permit, even though it had earlier supported the grant. Consumers Power Co., 7 A.E.C. 7 (1974); Union Electric Co., Docket Nos. 50-483, 50-486 (April 3, 1978) (Order to Show Cause why construction permit should not be suspended)