Laurence **GAGE** et al., Petitioners,

v.

**UNITED STATES ATOMIC ENERGY COMMISSION and United States of America**

**Commonwealth Edison Company, Intervenor.**

No. 72–1459.

United States Court of Appeals, District of Columbia Circuit.

Argued March 6, 1973.

Decided May 23, 1973.

Joseph Karaganis, Washington, D. C., with whom Wallace Duncan, Washington, D. C., was on the brief, for petitioners.

Jerome Nelson, Sol. A. E. C., with whom Kent Frizzell, Asst. Atty. Gen., Martin R. Hoffmann, Gen. Counsel, Harvey S. Price, Atty., A. E. C., Edmund B. Clark and Peter R. Steenland, Attys. Dept. of Justice, were on the brief, for respondent.

Marx Leva, Washington, D. C., with whom Craig Matthews, Richard Shlakman and Lois Schiffer, Washington, D. C., were on the brief, for intervenor.

William H. Cuddy, Hartford, Conn., filed a brief on behalf of American Electric Power Co. Inc., and others, as amici curiae.

Before TAMM and WILKEY, Circuit Judges, and JAMESON,* Senior United States District Judge for the District of Montana.

WILKEY, Circuit Judge:

This case arises on petition to review an order of the Atomic Energy Commission. The challenged order promulgated rules [1] designed to implement the National Environmental Policy Act (NEPA),[2] the policies of which are re-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. See 10 C.F.R. § 50.10. The regulations were proposed on 1 December 1971. 36 Fed.Reg. 22848. They were promulgated, in substantially the same form, on 21 March 1972. 37 Fed.Reg. 5745.

2. 42 U.S.C. § 4321 et seq.

quired to be reflected in agency regulations to the fullest extent possible.[3] As amended by the AEC's order, the regulations operate to prevent utilities from undertaking certain site preparation activities prior to the Commission's decision on their applications for permits to construct nuclear facilities. Since a detailed environmental impact statement must be issued and analyzed prior to the grant of such a construction permit, the regulations also operate to bar site preparation prior to environmental review.

Petitioners, who could have but did not participate in the underlying rule-making proceedings, challenge the regulations on the grounds that (1) NEPA requires the rules to go farther, to bar all land acquisition by license applicants before permit issuance, and (2) the regulations should themselves have been accompanied by a detailed statement concerning their impact on the environment. We hold that petitioners have come to the wrong forum with an inappropriate claim in search of an unavailable remedy. We dismiss their petition.

### I. *Facts*

The new regulations challenged here effect a radical change in the concept of "construction of a production or utilization facility" subject to AEC regulation and barred before issuance of a construction permit. Under previous provisions, a utility planning to build a nuclear facility could extensively alter the proposed site before the AEC had reviewed potential environmental impacts or decided on the construction permit

application.[4] The new rule bars "any clearing of land, excavation or other substantial action that would adversely affect the natural environment of a site and construction of non-nuclear facilities . . . for use in connection with the facility." However, the rule still allows, among other things, "changes desirable for the temporary use of the land for public recreational uses, necessary borings to determine foundation conditions or other preconstruction monitoring to establish background information related to the suitability of the site or to the protection of environmental values." [5]

Both on proposal and promulgation, the AEC stated that "the Commission considers these amendments to be consistent with the direction of the Congress, as expressed in Section 102 of the National Environmental Policy Act of 1969, that, to the fullest extent possible, the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in that act." [6] Petitioners primarily contend that these regulations do not in fact go "to the fullest extent possible" in implementing NEPA; specifically, that land acquisition prior to AEC approval is not barred.

Petitioners' current lively interest in the challenged regulations stems from their plight as farmers caught in the path of a land acquisition program undertaken by the Commonwealth Edison Company.[7] In November 1970 Edison applied for a construction permit to build a nuclear generating facility in

---

3. See Calvert Cliff's Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

4. Prior to these amended regulations, a utility was permitted to excavate, prepare the site, drive piles, and construct roadways, railroad spurs, transmission lines and "non-nuclear facilities" (such as turbogenerators) which would be used in connection with the "nuclear facility."

5. The new regulations also allow "construction of buildings which will be used for activities other than operation of a facility and which may also be used to

house a facility. . . . " 10 C.F.R. § 50.10(c)(3).

6. The Commission went on to declare that "these amendments will facilitate consideration and balancing of a broader range of realistic alternatives and provide a more significant mechanism for protecting the environment during the earlier stages of a project for which a facility or materials license is being sought."

7. The list of petitioners also includes numerous civic organizations to which these farmers belong.

LaSalle County, Illinois. Without awaiting any AEC action, the utility acquired 90% of the land needed for the proposed site and now plans to complete this acquisition with the use or threat of condemnation power granted by the State of Illinois.[8]

Petitioners contend that the mere acquisition of land—its change in ownership from these farmers or their landlords to Edison—would significantly damage the environment. Further, they argue that allowing acquisition to proceed before the AEC gets a chance to review the environmental impact of construction permit approval would change the balance of costs and benefits, thereby potentially affecting the AEC's decision.[9] Petitioners claim that NEPA requires the regulations to bar an applicant's acquisition of land before the AEC's grant of a construction permit, in order to prevent environmental damage and to protect the ability of the AEC to conduct a full and fair environmental review.

Notice of the proposed regulations, in substantially the same form as those promulgated, appeared in the *Federal Register* on 1 December 1971. Fifteen interested persons became parties to the rule-making proceedings and submitted comments. Significantly absent were both petitioners and any other party advancing the arguments they attempt to raise now before this court.[10] Petitioners stood aside, uninvolved, despite the fact that they had actual knowledge of the proceedings and were urged by AEC staff members to join the fray.[11]

## II. *Petition for Review*

■ Petitioners refrained from participating in the appropriate and available administrative procedure, which is the statutorily prescribed prerequisite for this court's jurisdiction to entertain their petition for review of an Atomic Energy Commission order. The Atomic Energy Act, at 42 U.S.C. § 2239, provides that "any person whose interest may be affected" by certain proceedings, including those concerning issuance or modification of rules dealing with the activities of licensees, may get a hearing on request and shall be admitted "as a party to such proceeding." Any final order of the AEC in such a proceeding

8. After extensive hearings, the Illinois Commerce Commission issued a Certificate of Public Convenience and Necessity for this project.

9. One of petitioners' major arguments against Edison's project is that the nuclear facility could be serviced by cooling towers, which would obviate the need for a large cooling lake and render much of the acquisition unnecessary. They claim that, in weighing these alternatives at the construction permit stage, the AEC will inevitably be influenced to some degree by the extent of acquisition which has already been completed.

10. The Sierra Club was a party to the rule-making. They suggested several changes, but did not argue that the regulations should include land acquisition within the concept of "construction" barred before permit issuance.

11. Since the record before us concerns the rule-making proceeding itself, in which petitioners did not participate, it obviously contains no evidence concerning their reasons for failing to join as parties. However, both sides concede that Gage, et al., were neither unaware of the proposed rule nor strangers to the AEC staff. At oral argument, counsel for petitioners attempted to justify their failure to intervene in the rule-making on the ground that the proposed rules said nothing at all about "acquisition," which was his clients' major concern. We cannot accept that excuse. The only fair reading of the proposed rules is that, on their face, they not only bar site preparation but also permit acquisition. They not only specifically allowed some types of construction but also clearly stated that they represented the AEC's current judgment on what was necessary to protect the environment to the fullest extent possible. Another attempted excuse was that the petitioners had already informally presented their views, without success, to the Commission staff. At best, this argument amounts to a claim that, once certain in their own minds that the AEC would reach a result contrary to their views in the rule-making, petitioners had no further obligation to participate in order to preserve their right to petition for review. We reject that contention.

is "subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended,[12] and to the provisions of section 10 of the Administrative Procedure Act, as amended."

This petition for review was brought pursuant to the Act of 29 December 1950, which grants the Court of Appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or determine the validity of . . . all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42." *Jurisdiction may be invoked* by the filing of a petition, under 28 U.S.C. § 2344, *by "any party* aggrieved by the final order." (Emphasis added.) Since petitioners were never parties to the rule-making proceedings, this court simply does not have jurisdiction over their claim.

■ Petitioners argue that the "party" status requirement, and the "exhaustion" doctrine implicit therein, does not apply in the context of an order promulgating rules of general and continuing effect. They base that claim on evidence that the Hobbs Act was originally intended to cover review of adjudicative orders. If taken too far, the argument from the legislative history of the Hobbs Act would lead to the conclusion that rule-promulgating orders are not properly the subject of petitions for review. That would vindicate petitioners' interpretation of the statute's origins; but it would also leave them without any remedy in this court. At best, their argument from legislative history is inconclusive.[13]

■ The clear words of the statutes involved make no distinction between orders which promulgate rules and orders in adjudicative proceedings. This court seems to have assumed that the "party" status requirement applies in either case.[14] In addition, the general policy supporting this requirement applies with, if anything, even more force in the context of direct appellate court review of rule-making.

Unlike requests for review of adjudicative orders, petitions for "direct" review of rule-promulgating orders demand judicial scrutiny of regulations which may well not have been applied in a concrete case.[15] Unlike adjudication, rule-making may proceed in the absence of those who may ultimately have a right to complain of the application of the regulations which result. Unlike those subject to adjudicative orders, persons who may ultimately be affected by regulations may have legitimate grounds for deciding not to join in the formulation of the rules. For example, the ultimate impact, or even the likelihood of enforcement, of proposed rules may be far from clear. Standing aside may not foreclose all opportunity to propose new

---

12. The Administrative Orders Review Act, hereinafter sometimes referred to as the "Hobbs Act."

13. The legislative history of the Atomic Energy Act contains no reference to, and shows no awareness of, any special problems created by providing "exclusive" court of appeals review of rule-promulgating "orders." See 1954 U.S.Code Cong. & Admin.News at p. 3456 et seq. However, the Supreme Court has rejected the notion that rule-promulgating orders may not be reviewed under the Administrative Orders Review Act. In Port of Boston Marine Terminal Assoc., et al. v. Rederiaktiebolaget Transatlantic, the Court described an argument that such orders were unreviewable because they "lacked finality" and had "no independent effect on anyone" as having "the hollow ring of another era." 400 U.S. 62, 70–71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

14. This court assumed that the status of the petitioners in Outward Continental No. Pac. Fr. Conf. v. FMC as "active parties to the rule-making proceedings which preceded issuance of [the contested orders]" was a prerequisite, along with their being "aggrieved," in order for the court to entertain their petition for review under the Hobbs Act. 128 U.S.App.D.C. 199, 200–201, n. 3, 385 F.2d 981, 982, n. 3 (1967). See also Easton Utilities Commission v. AEC, 137 U.S.App.D.C. 359, 424 F.2d 847 (1970).

15. See Vining, Direct Judicial Review and the Doctrine of Ripeness in Administrative Law, 69 Mich.L.Rev. 1443 (1971).

regulations or to challenge the validity of the promulgated regulations when they are applied to such a person's detriment in a concrete case; but such abstinence will probably preclude the compilation of a record adequate for judicial review of the specific claims he has reserved. That is what happened in this case—and the effect of this void in the record on our ability to analyze petitioners' major claim highlights the flaw in their petition for relief from this court.

■■ Petitioners seek expansion of a major rule of nationwide application on the basis of arguments which were never considered and which, therefore, are not addressed at all in the record compiled by the AEC. Yet the questions they raise would be very serious, complex and difficult even if a record had been compiled. The "party" status requirement operates to preclude direct *appellate* court *review* without a record

which at the least has resulted from the fact-finder's focus on the alternative regulatory provisions which petitioners propose. Whatever other routes may exist for their challenge to the validity of the promulgated regulations, petitioners' failure to join as "parties" to the rulemaking was at peril of their right to seek "direct" appellate review.

An extensive factual record would clearly be required in order to judge whether or not the present regulations implement the policies of NEPA "to the fullest extent possible." The actual environmental impact of acquisition *per se* would be an essential subject of inquiry.[16] The potential extent and effectiveness of efforts to delay site acquisition would also have to be explored. If long delays were necessary to assure full environmental review, an expanded regulation might frustrate early site acquisition designed to foster advance environmental impact planning.[17] On the

16. Although we do not reach the issue, the need for a record on actual environmental impact is highlighted by the speculative nature of petitioners' description of the harm done by Edison's acquisitions in LaSalle. While we cannot agree that the mere identity of Edison as a new landowner in the community could of itself damage the environment, we can tentatively accept petitioners' argument that any effects of such ownership on population density and use characteristics of the site environs" may constitute "environmental harm." See 10 C.F.R. § 100.10 (b). The broad sweep of NEPA's policies includes protection even of "culturally pleasing surroundings." 42 U.S.C. § 4331(b)(2). Petitioners claim that much rich farm land has been removed from cultivation as a result of adjacent owners' decisions to "sell out." However, it is far from clear that a conversion from farming *use* would not have occurred (or could have been prevented) even without this particular change in *ownership*. In any event, Edison contends that it has re-leased most of the property for farming purposes pending the AEC's decision. Indeed, the Illinois Commerce Commission has ordered it to minimize dislocation and ineffective land use. Even if we accepted petitioners' version of the facts, it would take careful analysis on a detailed record to convince this court that environmental (as opposed to economic) interests

were harmed by temporarily sparing the grassy plains of Illinois from the rude annual intrusion of the plow. We note that the distinct issue of the impact of subsequent conversion to nuclear power plant use will be considered in the construction permit proceedings.

17. Petitioners argue against acquisition before licensing on the ground that allowing the consolidation of utility-held acreage would affect the final cost-benefit balancing process when alternatives, such as those requiring less acreage or on sites for which no acquisition has begun, are considered. That argument tends to prove too much. Virtually *every* action taken independently by a private party whose project will eventually require government approval (and face a NEPA review) will affect the outcome of that analysis. For example, collection of certain types of technical personnel inevitably affects which sort of power plant can be constructed at lowest cost and which efforts to protect against environmental harm are technically feasible—yet petitioners could hardly argue that the AEC can or should hold up utility staffing decisions merely because the NEPA balancing process will necessarily be affected thereby. If every decision which altered the "cost of change" had to await an impact statement, we would soon be reduced to government by impasse.

other hand, an effective bar to pre-licensing acquisition might be impossible if utilities could purchase sites long before they even applied for an AEC construction permit. To the extent that acquisition may be necessary to gain access for adequate testing, petitioners' proposed regulation might make the filing of detailed environmental impact studies impossible and thereby conflict with a basic policy of NEPA itself.[18]

The absence of a developed record on such issues would preclude satisfying analysis of the many troubling legal issues lurking behind petitioners' proposal. Any reviewing court would have to decide whether or not a bar to pre-licensing acquisition exceeded the statutory mandate of the AEC,[19] impermissibly interfered with traditional state powers over land use and utility land acquisition, or unconstitutionally

---

18. 42 U.S.C. § 2232, along with related safety and environmental regulations, requires applicants to submit detailed environmental information concerning the proposed site prior to issuance of a construction permit. This information must relate to site criteria such as "[p]hysical characteristics of the site, including seismology, meteorology, geology and hydrology." 10 C.F.R. § 100.10(c). Much of this information may be unavailable without extensive on-site testing. Yet landowners hostile to the proposed project might well deny the necessary access. Precluding acquisition until after permit issuance might lead to a total stalemate.

19. NEPA does not mandate action which goes beyond the agency's organic jurisdiction. See Kitchen v. FCC, 150 U.S. App.D.C. 292, 464 F.2d 801 (1972). Application of the limits of the AEC's statutory mandate might produce two different sorts of analysis with respect to the two distinct prongs of petitioners' major argument. They claim, first, that the Commission's regulations should bar acquisition in order to prevent environmental harm resulting directly therefrom. While "construction" of a nuclear facility, including site preparation, will almost invariably involve activities which will eventually come within the overall jurisdiction of the AEC, acquisition of land by a utility may well precede construction of a fossil fuel plant of the type totally foreign to the Commission's regulatory sphere. Intervention to prevent environmental harm from private and non-federal action, as opposed to merely withholding its own "major federal action" of granting a construction permit until a NEPA review has occurred, may very well go beyond the AEC's organic power, especially where the Commission's eventual involvement is only indicated by a permit application which may be withdrawn at any time. See Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972). The cases cited by petitioners to the contrary are not in point since they all arose subsequent to the existence of statutorily mandated federal action or federal partnership in private action. See Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) ; Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972) ; La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D. Cal.1971) ; Silva v. Romney, 473 F.2d 287 (1st Cir. 1973).

Petitioners' second, and distinct, argument is that the regulations must bar acquisition before decision on the construction permit application in order to preserve the AEC's ability to conduct a fair environmental review. The cost of land acquisition at one site or another is certainly a factor which the AEC may *consider* in connection with its review of a construction permit application and the alternatives to approval which may be available. In this light, a bar of pre-licensing acquisition might legitimately operate not to control environmentally harmful private activity *per se* but to protect the AEC's own organic jurisdiction by preserving an unaltered balance of cost and benefit factors. And if the AEC's ban only applied to utilities with applications pending, the difficulties present with regard to the pure "prevention of environmental harm" argument discussed above might evaporate.

Of course, extension of the Commission's regulations "to the fullest extent" to protect the decision-making process in this manner may very well not be "possible" within the terms and purposes of NEPA itself. It may also not be practical, for until the utility filed an application for a construction permit, presumably AEC would have no jurisdiction. Site acquisition might take place with no officially announced intention, and thus not be subject to the present very definite environmental protection restrictions of the AEC regulations. Sustaining petitioners' position might thus be argued to promote evasion.

preempted private rights of free alienation. The reviewing court would also have to consider whether an expanded regulation would fail to serve the goals of NEPA because effective site-acquisition review requires centralized authority beyond the province of the AEC.[20] The resolution of any of those questions would be impossible without a detailed record concerning the practical workings of AEC licensing procedures, the extent and nature of state and private interests, the structure of the affected industry, and actual environmental effects. No such record is before this court.

The inappropriateness of the remedy sought by petitioners here is further highlighted by their counsel's description, at oral argument, of the relief they seek. Although their primary concern centers on Edison's acquisition program in Illinois, they were aware that this court lacks, at least in the context of a petition for review, the general equitable power required to issue an injunction directly against the utility. Even if we could entertain this petition for review, and even if we found the AEC regulations allowing acquisition unlawful, it would still be up to the AEC to issue new valid regulations and to seek an injunction in federal District Court against actions in violation of the expanded rules.[21] Recognizing this problem, petitioners asked for a general "declaration" to the effect that acquisition must stop. While we acknowledge their accompanying assertion that all of the parties would be respectful of the

court's view, the fact that the remedy they care most about is not available here gives pause.

In addition, petitioners apparently recognized that the record in this rule-making proceeding was totally devoid of the factual background required to analyze the issues they raised. Even the substantial data submitted in their briefs, gleaned from other proceedings and technically not before this court, would prove insufficient for the task. To calm us on that score, they suggested a remand to the Commission for further proceedings. However, since they can petition the AEC for rule-making proceedings on their proposal at any time,[22] such a remand is wholly unnecessary to provide a forum for their views. In short, petitioners' request for an unenforceable "remedy" and a superfluous remand demonstrates that they have simply come to the wrong forum for relief.

### III. *Alternative Remedies*

Petitioners argue that despite the inappropriate procedural posture of this case this court should nevertheless take jurisdiction because they will otherwise be forever deprived of an opportunity to advance their claims. Even if petitioners' sense of frustration were justified, we note that an absence of satisfactory alternative routes to review would not necessarily operate to create jurisdiction before this court.[23] Furthermore, petitioners have had and will continue to have numerous opportunities to voice their objections.

20. There are at least seven proposals now pending before Congress which would institute coordinated national regulation of power plant siting. See Brief of Intervenor at p. 24. It is quite possible that meaningful regulation would absolutely require centralized siting control. A utility might acquire a site, on a river for example, which could be water, fossil fuel, or atomic powered. Until a decision was made, no one could say whether the Army Corps of Engineers, Federal Power Commission, or Atomic Energy Commission would have regulatory jurisdiction.

21. See 10 C.F.R. § 50.110.

22. 10 C.F.R. §§ 2.802 and 2.803.

23. It is arguable that if no adequate alternative remedies appeared and if their failure to join as "parties" to the rule-making was justifiable, petitioners could bring an action for "direct" review of the regulations. For example, if one party had been entrusted to represent petitioners' interests but had, after promulgation, "dropped the cudgel," they might be entitled to petition for review. See Easton Utilities Commission v. AEC, 137 U.S. App.D.C. 359, 365, 424 F.2d 847, 853 (1970).

Despite reluctance to join formally in any AEC proceedings, petitioners have explored other avenues in an attempt to block Edison's acquisition program. They complained informally to the AEC staff. They intervened in a proceeding before the Illinois Commerce Commission in order to oppose the state's grant of eminent domain power with respect to the project in LaSalle County.[24] They filed a suit seeking injunctive relief against both Edison and the AEC in the District Court for the Northern District of Illinois.[25] Alternatives for the future include participation in the construction permit application proceedings and in any condemnation cases which may arise. To the extent that the AEC violated a clear, non-discretionary legal duty in failing to issue an environmental impact statement in conjunction with the promulgation of these regulations, injunctive relief may be available in a District Court.[26] Most significantly, with regard to the major claim presented in this case, petitioners retain the right to initiate rule-making before the AEC by formally proposing the promulgation of the expanded rules they desire.[27]

All these alternatives share the common characteristic of providing an opportunity to compile a detailed and focused record. Where appropriate, they allow the Commission a chance, within statutory limits, for informed exercise of its substantive discretion to issue regulations which protect the environment to the fullest extent possible. Together, they assure not only adequate but more meaningful review of every one of the various claims on which petitioners could conceivably deserve to gain relief. In contrast, this court could only act both ineffectively and out of ignorance. Accordingly, the petition for review is

Dismissed.

24. In its Docket No. 56034, the Illinois Commerce Commission conducted an exhaustive environmental review of both Edison's plans for this site and several alternatives. Petitioners were represented and fully participated. The Commission considered many factors, including the effects of the removal from production of the farm land in question.

25. Gage, et al. v. Commonwealth Edison Company, et al., 356 F.Supp. 80. The District Court issued its Memorandum and Order granting defendants' motions to dismiss on 27 November 1972. To the extent that their complaint could be read to challenge the validity of the AEC's regulations, the District Court concluded that this Court of Appeals had exclusive jurisdiction over that cause of action. To the extent that their complaint attacked the AEC's failure to prepare an environmental analysis prior to Edison's land acquisition, the District Court concluded that it might have jurisdiction to enjoin such "final agency inaction." While dismissing for lack of jurisdiction on more technical grounds, the court strongly suggested that it would also deny relief on the merits because the AEC had violated no "clear, non-discretionary legal duty." We should note in passing that we find the District Court's substantive analysis quite sound.

26. Standing for such a challenge in District Court would, of course, turn on a showing that the regulations had been applied specifically to petitioners' detriment. Their chances for success on the merits of that argument are even less than those on their major substantive claim. The Council on Environmental Quality has interpreted its own guidelines as not requiring a § 102 NEPA statement for regulations which themselves implement NEPA. See letter of CEQ General Counsel to the Chairman of the AEC, dated 17 August 1972, AEC Brief at p. 20.

27. Petitioners do have the right to petition the Commission for institution of a rule-making proceeding under 10 C.F.R. §§ 2.802 and 2.803. This course has been suggested to them by the AEC itself. Denial of such a petition would constitute a final order reviewable by this court.