COUNTY OF ROCKLAND, Petitioner,

v.

U.S. NUCLEAR REGULATORY COM-
MISSION and The United States of
America, Respondents,

Power Authority of the State of New York
and Consolidated Edison Company of
New York, Inc., Intervenors-Respon-
dents,

New York Public Interest Research
Group, Inc. and Union of Concerned
Scientists, Intervenors-Petitioners.

Nos. 1234, 1324, Dockets 83–4003,
83–4037.

United States Court of Appeals,
Second Circuit.

Argued April 14, 1983.

Decided May 27, 1983.

Eric Ole Thorsen, Asst. County Atty., County of Rockland, New City, N.Y. (Marc L. Parris, County Atty., County of Rockland, New City, N.Y., of counsel), for petitioner.

Michael B. Blume, U.S. Nuclear Regulatory Com'n, Washington, D.C. (Herzel H.E. Plaine, Gen. Counsel, Peter G. Crane, Acting Asst. Gen. Counsel, E. Leo Slaggie, Acting Sol., U.S. Nuclear Regulatory Com'n, Washington, D.C., Carol E. Dinkins, Asst. Atty. Gen., Albert M. Ferlo, Jr., U.S. Dept. of Justice, Washington, D.C., of counsel), for respondents.

Richard F. Czaja, New York City (David H. Pikus, Denise Y. Turner, Shea & Gould, Brent L. Brandenburg, Patricia M. Fruehling, New York City, of counsel), for intervenors-respondents.

Melvin L. Goldberg, New York City (Ellyn R. Weiss, Washington, D.C., Richard Hartzman, Craig Kaplan, New York City, of counsel), for intervenors-petitioners.

Robert Abrams, Atty. Gen., State of N.Y., Ezra I. Bialik, Steven D. Leipzig, Asst. Attys. Gen., State of N.Y., New York City, amicus curiae.

Before FEINBERG, Chief Judge, LUMBARD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

One of the most emotional issues confronting our society today is the adequacy of safety measures at nuclear power facilities. Fueled by the Three Mile Island incident, the debate over nuclear safety persists as public interest groups charge that serious problems remain and operator-utilities seek to assure the public that all reasonable measures have been taken to protect surrounding populations in the event of a major nuclear accident. But it is the United States Nuclear Regulatory Commission (NRC or Commission) which must decide the difficult questions concerning nuclear power safety.

This appeal focuses on one important aspect of nuclear safety—off-site emergency preparedness. In its December 1982 decision and February 1983 order, the NRC concluded that although several deficiencies remain in off-site emergency preparedness at the Indian Point nuclear plant in Buchanan, New York,[1] several important factors counseled against enforcement action to shut down or otherwise restrict operations at Indian Point. See J.App. at 2–10, 29. Petitioner County of Rockland and intervenors New York Public Interest Research Group, Inc. and Union of Concerned Scientists (intervenors collectively NYPIRG/UCS) urge this Court to overturn the Commission's decision and its order, claiming that serious deficiencies in emergency preparedness remain at Indian Point and that the NRC committed a profound error of judgment by failing to take enforcement action.

County of Rockland's petition is dismissed because it has failed to exhaust available administrative remedies. With respect to intervenors NYPIRG/UCS, we find that the Commission properly applied its regulations and did not abuse its discretion in declining to take enforcement action at Indian Point.

## BACKGROUND

A. *Overview of Nuclear Plant Regulations*

■ The Atomic Energy Act of 1954 (AEA), Pub.L. No. 83–703, § 1 *et seq.,* 68 Stat. 919 (codified at 42 U.S.C. § 2011 *et*

---

1. The Indian Point project is comprised of three nuclear generating units. Intervenor Power Authority of the State of New York (PASNY) owns and operates Indian Point Unit No. 3 under license from the State of New York and the NRC. Intervenor Consolidated Edison Company of New York, Inc. (Con Ed) owns and operates Indian Point Unit No. 2 under similar license. We are not privy to information concerning the existence, ownership and general operational status of Indian Point Unit No. 1; but this information is not necessary for purposes of deciding this appeal.

*seq.* (1976)), as amended by the Energy Reorganization Act of 1974 (ERA),[2] Pub.L. No. 93–438, § 1 *et seq., 88* Stat. 1233 (codified at 42 U.S.C. § 5801 *et seq.* (1976)), establishes a comprehensive regulatory framework for the ongoing review of nuclear power plants located in the United States. The NRC is charged under the AEA and ERA with primary responsibility to ensure, through its licensing and regulatory functions, that the generation and transmission of nuclear power does not unreasonably threaten the public welfare. Consistent with its administrative mandate, the NRC is empowered to promulgate rules and regulations governing the construction and operation of nuclear power plants. 42 U.S.C. § 2201(p) (1976); *see Public Service Company of New Hampshire v. United States Nuclear Regulatory Commission,* 582 F.2d 77, 82 (1st Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978).

We are concerned in this appeal with those Commission regulations that address off-site emergency preparedness. *See generally* 10 C.F.R. Part 50, § 50.54 (1982). Prior to the Three Mile Island accident (TMI), there were no comprehensive guidelines or rules in place to coordinate off-site emergency preparedness in the event of a major nuclear accident. TMI taught that

*ad hoc* responses to nuclear emergencies were ineffective. A Presidential Commission was created to address this problem and foremost among its recommendations was that each state and county located within a given distance of a nuclear power plant devise and implement an emergency preparedness plan for dealing with nuclear crises.

In partial response to the recommendations of the Presidential Commission, the NRC ordered that emergency preparedness plans be developed by each state and local government located within a ten mile radius of any nuclear power facility. 45 Fed. Reg. 55,402 (1980). The ten mile distance, although not etched in stone, was viewed by the Commission to be an appropriate "safety net" to assure adequate emergency preparedness.[3] States and counties within the "emergency planning zone" (EPZ) were expected to include in their plans procedures to ensure rapid dissemination of information to the public and to accomplish safe, efficient evacuation of endangered populations in the event of a major nuclear accident. In the case of Indian Point, the State of New York and four surrounding counties —Westchester, Rockland, Orange and Putnam—were affected by this regulation which mandated that emergency plans be

---

**2.** The ERA was adopted "[t]o reorganize and consolidate certain functions of the Federal Government in a new Energy Research and Development Administration [ERDA] and in a new Nuclear Regulatory Commission [NRC] in order to promote more efficient management of such functions." 88 Stat. 1233. Specifically, the licensing and regulatory functions of the Atomic Energy Commission were transferred to the NRC, 42 U.S.C. § 5842 (1976), and the energy research and development functions of the AEC were transferred to the ERDA, 42 U.S.C. §§ 5811–13 (1976 & Supp. I 1977). Although ERDA's administrative responsibilities have subsequently been transferred to the Department of Energy, Pub.L. No. 95–91, § 1, 91 Stat. 582 (codified at 42 U.S.C. § 7158(b) (Supp. I 1977)), the NRC retains jurisdiction over nuclear plant licensing and regulation.

**3.** The Commission regulation governing EPZs provides in pertinent part:

 (2) Generally, the plume exposure pathway EPZ for nuclear power plants shall consist of an area about 10 miles (16 km) in radius and the ingestion pathway EPZ shall consist of an

area about 50 miles (80 km) in radius. The exact size and configuration of the EPZs surrounding a particular nuclear power reactor shall be determined in relation to local emergency response needs and capabilities as they are affected by such conditions as demography, topography, land characteristics, access routes, and jurisdictional boundaries. The size of the EPZs also may be determined on a case-by-case basis for gas-cooled nuclear reactors and for reactors with an authorized power level less than 250 MW thermal. The plans for the ingestion pathway shall focus on such actions as are appropriate to protect the food ingestion pathway.
10 C.F.R. § 50.47(c)(2) (1982). Those states and counties within the 50 mile "ingestion pathway EPZ" were not required to prepare and implement an emergency evacuation plan, but rather were expected, in the event of a nuclear accident, to monitor vegetation and air quality for abnormal traces of radioactive material.

prepared and ready for implementation by April 1, 1981. We consider at length the various responses of the state and counties and analyze the status of off-site emergency preparedness at Indian Point after completing our examination of the administrative review process.

### B. Commission Review Process: State of Emergency Preparedness

The adequacy of emergency preparedness at a given nuclear facility is evaluated jointly by the NRC and the Federal Emergency Management Agency (FEMA). FEMA's general mandate, as outlined in Executive Order No. 12148 (July 15, 1979), is "to coordinate the emergency planning functions of executive agencies." 45 Fed. Reg. 55,406 (1980). Under Presidential directive of December 7, 1979, FEMA has been assigned lead responsibility for off-site emergency preparedness with respect to each nuclear power facility located in the United States. Id.

To coordinate the administrative review process, NRC and FEMA executed a Memorandum of Understanding (MOU) outlining the various responsibilities of the two agencies. See 45 Fed.Reg. 58,847, 82,713 (1980). Under the MOU, FEMA's duties include (1) assisting state and county officials in the development of an emergency plan; (2) training those state and county officials assigned to the emergency preparedness "team"; (3) developing and issuing an "updated series of [Federal] interagency assignments which would delineate respective agency capabilities and responsibilities and define procedures for coordination and direction for emergency planning and response"; (4) reviewing the status of emergency preparedness at each nuclear facility in the United States; and (5) making findings and determinations as to whether state and local emergency plans are adequate and capable of implementation. See 47 Fed. Reg. 36,387 (1982).

NRC's responsibilities under the MOU include (1) assessment of licensee emergency plans; (2) verification that licensee emergency plans are adequately implemented;

(3) review of FEMA findings and recommendations regarding the adequacy of state and county emergency plans; and (4) final decisionmaking authority to determine whether emergency preparedness is adequate or whether perceived problems are sufficiently serious to warrant enforcement action. See id.

■ The MOU and the enabling legislation found in the ERA make clear that the Commission is ultimately responsible for making the crucial decisions that arise with respect to emergency preparedness at nuclear facilities. The Commission's authority is broad—it may shut down a nuclear plant or take additional enforcement action if not satisfied with emergency preparedness.

The NRC's review is circumscribed by agency regulations. For facilities like Indian Point which are already operational, NRC regulations provide that emergency response plans for the operator-licensee and state and local governments shall be prepared and ready for implementation by April 1, 1981. 10 C.F.R. § 50.54(s)(2)(i) (1982). After that date, FEMA is charged with initial responsibility to review the state of emergency preparedness at the nuclear plant. NRC regulations then require the Commission to review the FEMA report and to determine whether emergency preparedness provides "reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency." 10 C.F.R. § 50.54(s)(2)(ii) (1982). If, after reviewing FEMA's recommendations and additional relevant factors, the Commission concludes that the evidence warrants a finding of "reasonable assurance," the agency review process is complete, subject of course to continuing oversight to assure that safety measures and emergency plans remain feasible and effective. If the Commission finds on the other hand that deficiencies in emergency preparedness are sufficiently serious to preclude a finding of "reasonable assurance," agency regulations allow a four month grace period, commonly referred to as a "120-day clock," to afford the operator-licensee and state and local governments an opportunity

to correct remaining problems. 10 C.F.R. § 50.54(s)(2)(ii) (1982).

At the end of the 120-day period, the Commission must again assess emergency preparedness to determine whether the deficiencies have been adequately corrected. If emergency preparedness remains deficient, the Commission has three options: (1) it may shut down the nuclear plant until serious deficiencies are remedied; (2) it may take other enforcement action such as ordering a show cause hearing or requiring the licensee to take specific affirmative steps to correct a problem; or (3) it may decline to take any enforcement action. *Id.*

NRC regulations provide that the Commission, when determining whether enforcement action should be taken, "shall take into account, among other factors, whether the licensee can demonstrate to the Commission's satisfaction that the deficiencies in the plan are not significant for the plant in question, or that adequate interim compensating actions have been or will be taken promptly, or that there are other compelling reasons for continued operation." *Id.*

## C. *Experience at Indian Point*

In April 1981, FEMA completed its initial review of off-site [4] emergency preparedness at Indian Point and reported several deficiencies to the Commission, notably the confusion between state and county authorities as to their respective obligations to prepare and implement an emergency preparedness plan. Upon reviewing FEMA's report, the Commission instituted the 120-day clock to enable the state and counties to correct problems identified by FEMA. The State of New York subsequently adopted a comprehensive set of guidelines to identify and delineate the various emergency planning responsibilities for the state and local offi-

cials. The guidelines proved effective; after reviewing the compliance efforts of state and local governments, the NRC staff and FEMA both recommended that no enforcement action should be taken at Indian Point. FEMA qualified its finding, however, by noting that a final determination regarding the adequacy of off-site emergency preparedness could not be made until a full-scale trial exercise was conducted at Indian Point. Relying on these findings, the Commission allowed the 120-day clock to expire in August 1981 without taking enforcement action.

### 1. *June 1982 FEMA Report*

In June 1982 the NRC staff requested updated FEMA findings regarding the adequacy of emergency preparedness at Indian Point. FEMA responded on June 30, 1982 explaining that its present recommendations were based upon review of (1) updated and revised state and county plans; (2) the results of a March 1982 emergency preparedness exercise at Indian Point; and (3) comments made during two public meetings held in Westchester and Orange Counties. After outlining the grounds for its conclusions, FEMA reported deficiencies in five planning standards at Indian Point and identified thirty four sub-element deficiencies within the five standards.[5] Citing these problems, on August 3, 1982 the Commission instituted a second 120-day clock at Indian Point. The response was encouraging: five task forces, consisting of personnel from FEMA, the United States Environmental Protection Agency, the United States Food and Drug Administration, New York State, the Power Authority of the State of New York (PASNY), the Consolidated Edison Company of New York, Inc. (Con Ed) and three counties located in the

---

**4.** Commission regulations also require licensees to prepare and implement *on-site* emergency plans. 10 C.F.R. § 50.47 (1982). The adequacy of Indian Point's on-site emergency preparedness plan is not at issue in this appeal.

**5.** In general, "sub-element deficiencies" are the more particularized problems that flow from deficiencies in the planning standard. Thus,

for example, since Rockland County's planning standard was deficient due to the county's failure to devise a workable emergency plan, several "sub-element" problems—*i.e.,* related to evacuation, communication, coordination of governmental functions—potentially flow from that planning deficiency.

EPZ [6]—Westchester, Orange and Putnam—were organized to address the deficiencies identified by FEMA. J.App. at 5. In the interim, the Commission asked FEMA whether it would be possible to conduct an emergency exercise at Indian Point before the 120-day clock expired so as to better gauge the status of emergency preparedness at that facility. FEMA indicated that it was not feasible to arrange for an emergency session before the 120-day deadline, but did note that an exercise had been scheduled at Indian Point for March 1983.[7]

### 2. December 1982 FEMA Report

After the second 120-day clock had expired, FEMA submitted on December 17, 1982 an updated status report to the Commission. Representatives of FEMA briefed the Commission on December 21, 1982, addressing each of the thirty four sub-element deficiencies identified in its prior June 1982 report and indicating that substantial progress had been made to correct those problems. FEMA officials also noted the exemplary cooperation between the various governmental and private entities responsible for emergency preparedness at Indian Point. Despite their optimism, FEMA representatives identified five remaining deficiencies, four of which related to the absence of an emergency plan for Rockland County, the final deficiency focusing on the inability of Westchester County to secure a contract with local bus drivers to provide emergency bus evacuation in the event of a nuclear accident. See Br. of Respondents, Attachment 6, at 9–10.

According to FEMA, the absence of a Rockland County plan raised serious prob-lems.[8] FEMA representatives did state, however, that significant progress had been made in developing an effective Rockland plan, largely due to the increased commitment and resolve of Rockland County officials. With respect to the Westchester bus problem, FEMA pointed out that the absence of an "emergency service" contract with the local bus drivers union made doubtful emergency evacuation of endangered populations. Although the State of New York proposed that National Guard troops could be mobilized to provide emergency bus service, FEMA concluded that the additional four to five hours required for mobilization was unsatisfactory. FEMA representatives conceded, however, that progress in negotiations had been made and that prior experience had shown that bus drivers do not shirk their responsibilities during emergency evacuations.

A FEMA representative summarized the agency's views: "We feel that the majority, 29 of the 34 specific deficiencies that had been identified have been satisfactory [sic] resolved by submissions and updates of the plan. We feel that the other five have been partially resolved and are in the process of being worked [sic], and hopefully will be completely resolved in the near future." Br. of Respondents, Attachment 6, at 14. FEMA qualified its judgment, however, by noting that a more definitive assessment could be made after evaluation of the March 1983 exercise.

### 3. Commission Decision of December 23, 1982

After considering the available evidence and internal staff views, the Commission

---

6. Rockland County is also within the Indian Point EPZ as identified by the Commission. Rockland officials declined to participate in the task force but did observe several planning sessions.

7. The exercise took place on March 9, 1983 and FEMA reported to the Commission on April 14, 1983. In its Post Exercise Assessment, FEMA indicated that the five remaining problems identified in its December 1982 report—four related to the absence of an effective Rockland County plan and one related to the Westchester bus problem—had yet to be corrected satisfac-torily. The Commission is presently in the process of reevaluating its December 1982 decision.

8. The three surrounding counties—Westchester, Orange and Putnam—had accepted an emergency plan developed by a private consultant who had been commissioned by the utility intervenors for this purpose. Rockland rejected this plan, choosing instead to devise its own plan. The FEMA report of April 14, 1983 indicates that Rockland has yet to complete this objective.

voted by a 3–2 margin on December 23, 1982, that no enforcement action would be taken presently at Indian Point.[9] The Commission observed that substantial progress in emergency off-site planning had been made at Indian Point and that all evidence indicated such progress would continue in the upcoming months. Moreover, the Commission noted that remedial actions proposed by the parties were feasible and capable of implementation within a short time. Finally, the likelihood of a major nuclear incident occurring within the "correction period" was viewed as very remote. Citing these factors, the Commission majority concluded that although deficiencies remained in emergency preparedness at Indian Point, these deficiencies were not sufficiently serious to warrant enforcement action at the present time. See J.App. at 8.[10]

Directing its attention to the Westchester bus problem, the Commission observed that substantial progress had been made in resolving the busing issue and that interim measures were adequate during negotiations with Westchester bus drivers. The Commission explained that any emergency evacuation could be accomplished in part through carpooling and that experience had shown that bus drivers do not shirk their responsibilities during emergencies. Moreover, the NRC staff had represented that if a fast-breaking nuclear accident were to occur, *sheltering*, not evacuation, would be the preferred initial safety procedure until the radioactive plume had passed. Hence, the four-to-five hour delay in mobilizing National Guard troops would be less dangerous; by the time the radioactive plume had passed, National Guard troops would be

positioned to evacuate surrounding populations.

Shifting its focus to the Rockland County situation, the Commission conceded that the county's failure to develop and implement an emergency plan raised troubling questions concerning the overall status of emergency preparedness at Indian Point. The Commission did indicate, however, that it was impressed with the efforts of Rockland officials to devise a workable emergency plan for the county. Moreover, the State of New York had developed a generic emergency preparedness plan that had been supplemented by site-specific planning for Rockland County. The Commission observed that a "senior management team (comprised of six state agencies) has been identified, and training has been initiated [to implement the state's generic plan in Rockland County]." J.App. at 7. The Commission viewed the state's plan as an adequate interim compensating measure while Rockland County worked to complete its plan.

## DISCUSSION

### A. Procedural Claims

#### 1. Exhaustion: Rockland County

The Commission, joined by utility intervenors PASNY and Con Ed, argue that Rockland's petition should be dismissed because the county has failed to exhaust available administrative remedies. We agree. This action reaches us on Rockland's petition for review of an administrative order in which the Commission declined to shut down or take alternative enforcement

**9.** Chairman Palladino and Commissioners Ahearne and Roberts voted with the majority. Commissioners Gilinsky and Asselstine dissented, urging that enforcement action should be taken immediately at Indian Point. See J.App. at 2–30.

**10.** The Commission qualified its decision by indicating that the conclusions reached therein would be reexamined after the March 1983 exercise had been evaluated by FEMA. Indeed, Commissioner Ahearne intimated that his vote was conditioned on the successful completion of the March exercise:

> This has been a close judgment and I wish to revisit this issue one month after the exercise, and certainly no later than the end of April. At that time we should have FEMA's evaluation of the exercise, as well as a resolution of the Westchester County bus driver issue and approved Rockland County emergency plans. If these do not occur, at present I do not believe I would support continued operation of the plants.
>
> See J.App. at 19.

action at Indian Point. Our jurisdiction extends to all final orders of the Commission. 28 U.S.C. § 2342(4) (1976 & Supp. V 1981); 42 U.S.C. § 2239(b) (1976). Section 189 of the Atomic Energy Act states that *"any person whose interest may be affected"* by an order of the Commission is entitled to a hearing on request and shall be admitted "as a party to such proceeding." *See* 42 U.S.C. § 2239 (1976 & Supp. I 1977) (emphasis added), amended by 42 U.S.C. § 2239 (West Supp.1983). Any party aggrieved by a final order of the Commission may file a petition for review in the court of appeals. 28 U.S.C. § 2234 (1976).

Rockland clearly qualified as an entity "whose interest may be affected" by the Commission's review of emergency preparedness at Indian Point. As such, the county could have participated in the December 1982 Commission proceedings and would have been entitled to party status for purposes of appeal. Alternatively, Rockland could have filed a section 2.206 petition [11] challenging the December 1982 order and could have appealed in this forum if the Commission refused to grant its petition. 10 C.F.R. § 2.206 (1982); *see Rockford League of Women Voters v. United States Nuclear Regulatory Commission,* 679 F.2d 1218, 1219 (7th Cir.1982); *Porter County Chapter of the Izaak Walton League of America, Inc. v. United States Nuclear Regulatory Commission,* 606 F.2d 1363, 1365 (D.C.Cir.1979). If the county chose either of these options, the jurisdictional requirements of 42 U.S.C. § 2239 would have been satisfied.

The "party status" rule is premised on the exhaustion doctrine, a judicially created concept which serves a vital function in the context of administrative decisionmaking:

The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.

*Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972); *see McKart v. United States,* 395 U.S. 185, 194–95, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1968); *see generally Gage v. United States Atomic Energy Commission,* 479 F.2d 1214, 1217–21 (D.C.Cir.1973). Since Rockland has failed to offer any convincing reason or justification for its failure to exhaust available administrative remedies, its petition is dismissed. *See Gage v. United States Atomic Energy Commission,* 479 F.2d at 1216 ("We hold that petitioners have come to the wrong forum with an inappropriate claim in search of an unavailable remedy."); *see also Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 238–39 (3d Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981).

### 2. *Exhaustion: NYPIRG/UCS*

 Intervenors NYPIRG/UCS filed an administrative petition pursuant to section 2.206. Because the petition was considered and denied by the Commission, it is properly before this forum. *See Rockford League of Women Voters v. United States Nuclear Regulatory Commission,* 679 F.2d 1218, 1221 (7th Cir.1982); *Porter County Chapter of the Izaak Walton League of America, Inc. v. United States Nuclear Regulatory Commission,* 606 F.2d 1363, 1368 (D.C.Cir.1979). However, that petition only challenged the August 1982 decision to begin a second 120-day clock—it was not directed to the December 1982 Commission order. Ordinarily, this flaw would be fatal insofar as our review of the unchallenged December order. However, the Commission's order of February 3, 1983 denying the NYPIRG/UCS petition makes it difficult to separate the merits of the August and December decisions. In fact, the Commission

---

11. Section 2.206 provides in pertinent part:
§ 2.206 Requests for action under this subpart.
(a) Any person may file a request for the Director of Nuclear Material Safety and Safeguards, Director, Office of Inspection and Enforcement, as appropriate, to institute a proceeding pursuant to § 2.202 to modify, suspend or revoke a license, or for such other action as may be proper.
10 C.F.R. § 2.206 (1982).

states in its February 1983 order that the December 1982 decision supersedes all prior NRC orders with respect to emergency preparedness at Indian Point and therefore no useful purpose would be served by review of the August decision to begin a second 120-day clock. By couching its order in these terms, the Commission implicitly has put in issue the merits of both the August and December 1982 decisions and we will consider all claims relating thereto.

### 3. *Finality*

The utility intervenors urge that the Commission's December 1982 enforcement ruling is not a final order and hence is not appealable at this time. The utilities cite language in the December 1982 decision which states that the judgment to forego enforcement action will be reexamined after the March 1983 emergency exercise at Indian Point. J.App. at 10.

■ The fact that the Commission may reexamine its decision at a later date does not detract from the final nature of the December decision. The Commission unequivocably held that no enforcement action would be taken at Indian Point at that time and serious legal consequences flow from that decision—the intervenor utilities are authorized to restart operations at Indian Point. *See Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970); *Illinois Citizens Com-*

*mittee for Broadcasting v. F.C.C.,* 515 F.2d 397, 402 (D.C.Cir.1975). If a nuclear accident happened after the Commission declined to take enforcement action at Indian Point, the harm to surrounding populations could be immediate and the consequences catastrophic. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *New York Shipping Association v. Federal Maritime Commission,* 495 F.2d 1215, 1218–20 (2d Cir.1974), *cert. denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1975). To hold that this decision is nonreviewable would mean that any Commission order short of a shutdown order entered after a review of an emergency plan would be unreviewable.[12]

### B. *Substantive Claims*

Intervenors NYPIRG/UCS mount a twofold attack on the Commission's December 1982 decision. They argue that the Commission failed to follow agency regulations when it declined to take enforcement action despite finding serious deficiencies in emergency preparedness at Indian Point. They also assert that the Commission acted arbitrarily and capriciously, and abused its discretion, by failing to shut down or to take other enforcement action at Indian Point.[13]

### 1. *Failure to Follow Agency Regulations*

■ Intervenors NYPIRG/UCS argue in substance that NRC regulations *require*

---

**12.** The experience at Indian Point highlights the problems arising with respect to the finality doctrine in nuclear safety cases. The Commission is charged with oversight responsibility to ensure that safety precautions remain adequate at all nuclear facilities. Given the nature of its statutory mandate, *every* order is subject to reexamination as new findings are reported and exercises conducted. Indeed, the Commission is presently reevaluating off-site emergency preparedness at Indian Point after the March 1983 exercise. Notwithstanding these limitations, every order filed by the Commission must be evaluated in light of the "finality" factors as articulated in the case law. *See, e.g., Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 69–72, 91 S.Ct. 203, 208–10, 27 L.Ed.2d 203 (1970). Otherwise, the Commission potentially could insulate itself from appellate review sim-

ply by labeling a decision as "interim" or subject to reexamination.

**13.** Although not argued forcefully on appeal, intervenors NYPIRG/UCS did contend in their section 2.206 petition that the Commission acted in contravention of agency regulations and abused its discretion by ordering in August 1982 that a second 120-day clock be started at Indian Point. We find nothing in the language, legislative history or regulations promulgated pursuant to the AEA or ERA which would impose a one 120-day limitation on the Commission. Furthermore, the problems giving rise to the first 120-day clock were corrected and the second 120-day clock was started to address deficiencies identified *after* the first 120-day clock had expired.

the Commission to shut down or to take other enforcement action against a nuclear facility if it determines that (1) "the state of emergency preparedness does not provide reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency;" and (2) the factors enumerated in 10 C.F.R. § 50.-54(s)(2)(ii) (1982) do not lead to a different result. We disagree.

NRC regulations provide that if the Commission determines that a finding of "reasonable assurance" cannot be made, then it must decide whether enforcement action should be taken. In reaching its decision, the Commission is guided by, *among other factors,* the relative significance of the deficiencies, whether adequate interim compensating measures have been or will be taken promptly and whether there are additional compelling reasons for continued operation. 10 C.F.R. § 50.54(s)(2)(ii) (1982). In this case, the Commission considered, among other factors, that substantial progress had been made to correct deficiencies at Indian Point, that the remaining problems would likely be corrected within a short period of time and that the likelihood of a severe nuclear accident in the intervening "correction period" was extremely remote. Weighing these factors, the Commission determined that no enforcement action should be taken at this stage in the emergency planning process at Indian Point. We find nothing in the language or legislative history of the AEA or ERA, nor in the regulations promulgated by the Commission, that would preclude it from relying on these factors when considering whether enforcement action is necessary. Congress has given the Commission considerable latitude to decide the difficult questions that arise with respect to nuclear safety. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). We will not unduly circumscribe that latitude by placing unwarranted restrictions on the agency review process.

2. *Propriety of December 1982 Decision*

■ The intervenors assert that the Commission acted arbitrarily, capriciously and abused its discretion by declining to take enforcement action to correct deficiencies in emergency preparedness at Indian Point. Again, we disagree.

When considering a petition for review of a final Commission order, we are guided by the arbitrary and capricious standard found in section 10(e) of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A) (1976). The courts have cautioned that the section 10(e) standard of review is "narrow," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and "highly deferential," *Ethyl Corp. v. E.P.A.,* 541 F.2d 1, 34 (D.C.Cir.1976) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Although couched in different terms by the various federal courts, the fundamental duty of the appellate court on review remains well established:

> The test here is primarily one of rationality. If the Commission based its order on substantial relevant evidence, fairly ascertained, and if it has made no clear error of judgment, this court is not authorized to overturn that order.

*Cross-Sound Ferry Services, Inc. v. United States,* 573 F.2d 725, 730 (2d Cir.1978); *see Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Benmar Transport & Leasing Corp. v. I.C.C.,* 623 F.2d 740, 743 (2d Cir.1980). Our review is deferential because the Commission and its staff have special expertise and a wide range of experience in nuclear power plant operation and safety.

■ The December 1982 Commission decision and February 1983 order were not irrational. The seminal question raised in the Indian Point proceedings was whether emergency preparedness would be sufficient to provide reasonable assurance that those people within the ten mile EPZ surrounding Indian Point would be adequately protected in the event of a major nuclear accident. FEMA undertook an exhaustive

study of this issue and found that substantial progress had been made in emergency preparedness at Indian Point and that the remaining deficiencies—the absence of a Rockland plan and the Westchester busing issue—could be corrected within a short period of time. The Commission reviewed the FEMA recommendations and ultimately made the difficult decision that, on balance, no enforcement action should be taken at that time. Intervenors have offered no convincing evidence to discredit the factual findings and conclusion reached by the Commission. We will not substitute our judgment for that of the Commission. There is substantial evidence in the record to support the Commission's decision.

We, of course, express no view on the proceeding regarding the Indian Point plant now pending before the Commission as a result of the March 1983 exercise.

Petition for review is denied.